Michael P. Lehmann (SBN 77152)
Christopher L. Lebsock (SBN 184546)
Bonny E. Sweeney (SBN 176174)
Bruce J. Wecker (SBN 78530)
Samantha J. Stein (SBN 302034)
**HAUSFELD LLP**
600 Montgomery St., Suite 3200
San Francisco, CA 94111
Tel: (415) 633-1908
Fax: (415) 358-4980
Email: mlehmann@hausfeld.com
Email: clebsock@hausfeld.com
Email: bsweeney@hausfeld.com
Email: bwecker@hausfeld.com
Email: sstein@hausfeld.com

Michael D. Hausfeld (*pro hac vice* forthcoming)
**HAUSFELD LLP**
1700 K Street, NW, Suite 650
Washington, DC 20006
Tel: (202)-540-7200
Fax: (202)-540-7201
Email: mhausfeld@hausfeld.com

Shpetim Ademi (*pro hac vice* forthcoming*)*
**ADEMI & O'REILLY, LLP**
3620 East Layton Avenue
Cudahy, WI 53110
Tel: (414) 482-8000
Fax: (414) 482-8001
Email: sademi@ademilaw.com

*Attorneys for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| JULIE EWALD, TOM PARKIN, BRIAN DEPPERSCHMIDT, KYLE WEBER and BRANDON STEELE, Individually and on Behalf of All Others Similarly Situated,<br><br>      Plaintiffs,<br><br>      vs.<br><br>QUALCOMM INCORPORATED, A DELAWARE CORPORATION,<br><br>      Defendant. | Case No. 5:17-cv-565<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE ANTITRUST LAWS, STATE UNFAIR COMPETITION LAWS, AND THE COMMON LAW OF UNJUST ENRICHMENT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs, by and through their undersigned attorneys, bring this proposed class action and allege as follows:

## I.   INTRODUCTION

1.      Plaintiffs and proposed class members are purchasers of cellular telephones and other cellular devices, such as computer tablets.  In each such device, there is a modem chipset (also called a baseband processor), which allows the device to communicate and transmit voice and data across wireless networks controlled by wireless carriers, such as Verizon or Sprint.  Plaintiffs bring this action against Defendant Qualcomm Incorporated ("Qualcomm") for its anticompetitive conduct in acquiring and maintaining monopolies over the modem chipset market and the licensing market for "standard essential patents" or "SEPs" related to that technology.  As a result of Qualcomm's anticompetitive conduct, described below, Qualcomm has charged device manufacturers an excessive and unlawful royalty on the net selling price of each cellular device, which in turn has inflated the price paid by each end-user purchaser of such devices.

2.      To communicate with an operator's network, a cellular device must contain a modem chipset that complies with cellular communications standards that the network supports.  Standard setting organizations ("SSOs"), comprised of device and device component manufacturers as well as others, collaborate to set technology requirements ("standards") to ensure mass interoperability among all system components.  Because a standard requires that devices utilize a specific technology, standard-compliant devices will, in some cases, infringe on certain patents for technology incorporated in the standard.  Such patents are the aforementioned SEPs.  SEP holders benefit by obtaining licensing fees and royalties associated with use of their technology.  Given the power such standards may give SEP holders, before selecting a standard, SSOs consider various alternative technologies, and importantly, also require that the developers of these standards agree to license their technology on fair, reasonable, and nondiscriminatory ("FRAND") terms.  This ensures that competitors may use the technology rather than being excluded from the market, and device manufacturers may use the technology without being subjected to unreasonable terms.

3.     Qualcomm pioneered a technology known as Code Division Multiple Access ("CDMA"), which provided a means for cellular devices to communicate with their wireless networks.  Qualcomm was, and continues to be, the dominant producer of CDMA-modem chipsets and also holds the largest number of SEPs for CDMA technology.

4.     Qualcomm used its early leverage over CDMA technology to control the modem chipset supply (and SEPs related to that technology) to unlawfully acquire and maintain its monopolies over these markets.  CDMA became the standard used by Verizon and Sprint, which directly stemmed from Qualcomm's promise to SSOs that it would comply with FRAND requirements if the SSOs adopted Qualcomm's CDMA technology as their standard, rather than basing the standard on other technologies that competed with CDMA.  As a result, device manufacturers such as Apple Inc. ("Apple") had to incorporate Qualcomm's CDMA technology for its devices to communicate with Verizon and Sprint.  Thus, having agreed to license its technology on FRAND terms, Qualcomm's technology has been incorporated into virtually every relevant cellular standard in the last several years.  Qualcomm has targeted a total "service addressable market" that it claims was worth $23 billion in 2015 and will be worth about $100 billion in 2020.[1]

5.     Qualcomm, however, took unfair advantage of standard-setting process by taking and manipulating all of the benefits of that process while refusing to comply with the FRAND commitments it made to SSOs to induce them to select Qualcomm's technologies for their standards.  Among other things, Qualcomm (1) refused to license, or alternatively imposed onerous restrictions on licenses of, its SEPs to competing chipset makers; (2) conditioned the supply of its CDMA chipsets on agreeing to Qualcomm's license agreements for its entire patent portfolio, including non-SEPs; (3) entered into exclusive deals with certain cellular device manufacturers, such as Apple; and (4) ignored the requirements of SSOs to license its SEPs to patent users on FRAND terms to extract unreasonably high, unilaterally determined royalty payments.

---

[1] Paige Tanner, *Qualcomm Is Targeting $100 Billion Market By 2020*, Market Realist (Mar. 16, 2016), http://marketrealist.com/2016/03/qualcomm-targeting-100-billion-market-2020/.

6.    Plaintiffs and the class of persons they seek to represent have been harmed by paying supracompetitive prices for the cellular devices they purchased.  Qualcomm "parlayed its pioneering role in cellular technology into a patent-licensing business that generates most of its profits.  Qualcomm charges a royalty on nearly every smartphone made, whether or not the device uses its chips."[2]  Qualcomm admits in its Form 10-Q filed on June 29, 2016 with the Securities & Exchange Commission ("SEC") that "[r]oyalties are generally based upon a *percentage of the wholesale (i.e., licensee's) selling price of complete licensed products*, net of certain permissible deductions (including transportation, insurance, packing costs and other items)."  (Emphases added).  Qualcomm typically charges cellular device manufacturers up to 5% of their product's wholesale price—around $20 on a $400 phone.

7.    Qualcomm's anticompetitive conduct has been investigated and met with condemnation by regulators around the world.  On September 9, 2009, the Japanese Fair Trade Commission ("JFTC") issued a cease and desist order against Qualcomm on the grounds that Qualcomm had violated its FRAND obligations.  On February 10, 2015, the Chinese National Development & Reform Commission ("NDRC") found that Qualcomm had abused its monopoly power and restricted competition in violation of the country's Anti-Monopoly Law, fining Qualcomm $975 million.  On December 21, 2016, the Korea Fair Trade Commission ("KFTC") fined Qualcomm $854 million (the largest fine in its history) for abuse of market dominance and anticompetitive conduct with respect to its licensing practices.

8.    Most recently, on January 17, 2017, the United States Federal Trade Commission ("FTC") filed a civil suit against Qualcomm in this Court on January 17, 2017, challenging Qualcomm's unlawful maintenance of a monopoly in baseband processors and alleging Qualcomm has excluded competitors and harmed competition—to the detriment of consumers who, as a result, paid increased prices for cellular devices.  *See Federal Trade Commission v. Qualcomm Inc.*, Case No. 17-cv-220-LHK (N.D. Cal., filed Jan. 17, 2017).

---

[2] Don Clark, *Qualcomm's Main Profit Driver is Under Pressure*, The Wall Street Journal (Apr. 13, 2015), http://www.wsj.com/articles/qualcomms-main-profit-driver-is-under-pressure-1428967051.

9.      The FTC's action has also spurred Apple to file an antitrust, intellectual property, and contract suit against Qualcomm.  *See Apple Inc. v. Qualcomm Inc.*, Case No. 17-cv-0108-GPC/NLS (S.D. Cal., filed Jan. 20, 2017).  In addition, Apple has commenced a $145 million patent action against Qualcomm in a Chinese intellectual property court.[3]

10.      Plaintiffs bring this action on behalf of themselves and others similarly situated to recover for their injuries resulting from Qualcomm's violations of Sections 2 and 3(b) of the Sherman Act, as well as violations of state antitrust and consumer protection laws. Plaintiffs seek monetary damages, injunctive relief, and any other available remedies to which they are entitled to as a result of Qualcomm's unlawful conduct.

## II.      PARTIES

### A.   Plaintiffs

11.      Plaintiff Julie Ewald ("Ewald") is a resident of Las Vegas, Nevada.  Ewald purchased an Apple iPhone 6 for personal use and not for resale.

12.      Plaintiff Brandon Steele ("Steele") is a resident of Beckley, West Virginia. Steele purchased an Apple iPhone 6s, for personal use and not for resale.

13.      Plaintiff Tom Parkin ("Parkin") is a resident of Dubuque, Iowa.  Parkin purchased an iPhone 5c for personal use and not for resale.

14.      Plaintiff Kyle Weber ("Weber") is a resident of Elm Grove, Wisconsin.  Weber purchased an iPhone 6 for personal use and not for resale.

15.      Plaintiff Brian Depperschmidt ("Depperschmidt") is a resident of Wichita, Kansas.  Depperschmidt purchased an iPhone 7 plus and a Samsung Galaxy S5.

### B.   Defendant

16.      Defendant Qualcomm is a Delaware corporation having its principal place of business at 5775 Morehouse Drive, San Diego, California 92121.  Qualcomm develops, designs, licenses, and markets worldwide its digital communications products and services, primarily through its two main business segments: Qualcomm CDMA Technologies ("QCT")

---

[3] Brian Heater, *Apple files a $145 million patent suit against Qualcomm in China*, TC's Crunchboard (Jan. 25, 2017), https://techcrunch.com/2017/01/25/apple-qualcomm-2/.

1    and Qualcomm Technology Licensing ("QTL"), both wholly-owned subsidiaries of

2    Qualcomm.  QCT deals with equipment sales while QTL grants licenses or otherwise

3    provides rights to use portions of Qualcomm's patent portfolio.  QCT is operated by

4    Qualcomm Technologies, Inc. ("QTI"), another wholly-owned subsidiary of Qualcomm.

5         17.    Qualcomm has extensive offices and employees throughout this District,

6    including in San Francisco, Santa Clara, and Alameda counties,[4] and regularly conducts

7    business here.  Many of its licensees are also located in this District.

8    **III.    JURISDICTION AND VENUE**

9         18.    This action arises under Sections 4 and Section 16 of the Clayton Act, 15

10   U.S.C. §§ 15(a) and 26, for Qualcomm's violations of Section 2 of the Sherman Act, 15

11   U.S.C. § 2 and Section 3(b) of the Sherman Act, 15 U.S.C. § 3(b).  The Court has subject

12   matter jurisdiction over this claim pursuant to 28 U.S.C. §§ 1331 and 1337.

13        19.    Plaintiffs also bring claims under state laws as set forth herein.  The Court has

14   supplemental jurisdiction over these pendant state law claims under 28 U.S.C. §§ 1332(d) and

15   1367.  Each of Plaintiffs' state law claims arises out of the same factual nucleus as Plaintiffs'

16   federal law claims.

17        20.    Venue is proper in this Court pursuant to Section 12 of the Clayton Act, 15

18   U.S.C. § 22 and 28 U.S.C. § 1391 because a substantial part of the events giving rise to

19   Plaintiffs' claims occurred in this District, and Qualcomm transacts business and maintains

20   facilities in this District and thus is subject to personal jurisdiction here.  Qualcomm is

21   engaged in interstate commerce, and its activities, including those activities that form the

22   basis of this Complaint, substantially impact interstate commerce.

23        21.    Millions of relevant cellular devices were purchased at artificially inflated rates

24   in this District.

25   //

26   //

27

28   _____

[4] Qualcomm, *Offices & Facilities*, https://www.qualcomm.com/company/facilities/offices
(last visited Jan. 16, 2017).

CLASS ACTION COMPLAINT

**IV.  INTRADISTRICT ASSIGNMENT**

22.  Pursuant to the Northern District of California's Civil Local Rule 3-2(c-e), the intradistrict assignment should be to the San Jose Division.  This action arises in Santa Clara County because a substantial part of the events giving rise to these claims occurred there.  Additionally, Qualcomm has offices in Santa Clara and San Jose, and third parties that have information relevant to this action, including leading cellular device manufacturers and Qualcomm competitors, also have offices in Santa Clara County.  As noted above, the FTC also filed a case in the San Jose Division concerning the same practices at issue in this case.

**V.  FACTUAL BACKGROUND**

**A.  SSOs, SEPs, and FRAND Obligations**

23.  Interoperability and compatibility are critical for most modern electronic devices.  A wireless network (such as those operated by AT&T, Verizon, and Sprint) must be able to communicate with cellular devices utilizing that cellular network and visa versa.  Accordingly, their infrastructure and design, and the components underlying that infrastructure and design, must work together, regardless of which company made them.

24.  Cellular devices contain a modem chipset – the core electronic unit that allows it to transmit and receive information (either voice telephone calls or data) to and from the wireless network.  Specifically, these chipsets transmit information, via radio waves, to cellular base stations.  Base stations, in turn, transmit information to and from telephone and computer networks.  It is essential that all components involved in this transmission be able to communicate seamlessly with one another.

25.  Because of the multitude of devices and technologies, device designers, component manufacturers, and others have agreed to uniform standards to ensure the smooth operation of the wireless network and the cellular devices that connect to it.  To achieve this, wireless network carriers, chipset manufacturers, cellular device manufacturers, and others have established SSOs, such as the European Telecommunications Standard Institute ("ETSI"), the International Telecommunications Union ("ITU"), the Institute of Electrical and

1  Electronic Engineers ("IEEE"), and, in the United States, the Telecommunications Industry

2  Association ("TIA").

3      26.     SSOs collaborate to set technology requirements that ensure mass

4  interoperability among all system components.  The technology incorporated into a standard

5  is typically chosen from among different options.  Once incorporated and widely adopted, that

6  technology is not always used because it is the best or the only option; it is used because it is

7  necessary to comply with the standard.  Competition is eliminated as alternatives cannot

8  comply with the standard.  Additionally, to implement a technological standard, devices often

9  need to incorporate a patented invention on which the standard is based.  These are the SEPs

10 discussed previously.  Holders of patents essential to technology incorporated into a standard

11 declare their patents as SEPs.  Consequently, to be compliant with the applicable standard,

12 manufacturers of products using the patented technology generally need to license the SEP.

13     27.     Antitrust law recognizes that, under certain circumstances, collaboration by

14 industry participants can increase competition, innovation, product quality, and consumer

15 choice.  For example, in this context, collaboration allows consumers to be confident that

16 cellular devices bought from different manufacturers will operate with each other and with the

17 wireless network that they choose.  Similarly, common standards allow component

18 manufacturers, carriers, and others in the industry to invest in technological advancement with

19 confidence that their products will work with wireless networks.

20     28.     However, standards can pose challenges to device and device component

21 manufacturers and can involve tradeoffs for consumers.  For example, a company

22 implementing standards in a product must use certain mandated technologies, even where

23 many viable and perhaps even superior alternatives exist.  Once a standard is adopted,

24 participants begin to make investments tied to the implementation of the standard.  Because

25 these participants may face substantial switching costs in abandoning initial designs and

26 substituting a different technology, an entire industry can become "locked in" to a standard.

27     29.     The adoption of SEPs into technological standards also enhances the potential

28 for abuse by the patent owner.  "Patent hold-up" occurs when a SEP holder demands

CLASS ACTION COMPLAINT

1    excessive royalties after companies are locked in to using a standard.  Where standardized

2    technologies are covered by patents, companies that choose to implement a standard in

3    their products have no choice but to license those patents (and accept the licensor's

4    terms) or face a lawsuit if they use the technology without a license.  "Royalty stacking"

5    arises when a standard implicates numerous patents.  These royalty payments "stack" on top

6    of each other and, in turn, inflate the cost of the product to the consumer.  Royalty stacking

7    can be a significant concern:

8               The data show that royalty stacking is not merely a theoretical concern.
                Indeed, . . . we estimate potential patent royalties in excess of $120 on
9               a hypothetical $400 smartphone—which is almost equal to the cost of
                device's components.   Thus, the smartphone royalty stack across
10              standardized and non-standardized technology is significant, and those
                costs may be undermining industry profitability—and, in turn,
11              diminishing incentives to invest and compete.[5]

12

13   30.     To help alleviate these potential concerns, before agreeing to a particular

14   standard, SSOs seek certain assurances from patent owners.  Specifically, SSOs ask SEP

15   holders agreed to license their patents on fair, reasonable, and non-discriminatory terms,

16   referred to as a SEP holder's FRAND obligations.  For example, the IEEE asks SEP holders

17   to pledge that they will grant licenses to an unrestricted number of applicants on "reasonable,

18   and nondiscriminatory" (or "RAND") terms.  If a patent holder does not choose to make

19   this promise, the SSOs design a standard without using the patented technology.

20   31.     FRAND obligations are designed to, among other things, prevent SEP holders

21   from wielding control over essential technology and restricting competition, development,

22   and research related to the standard.  SEP holders generally agree to FRAND terms because

23   SSOs may exclude the holder's technologies from the standard if it does not agree to FRAND

24   terms.  SEP holders also benefit from license fees and royalties they gain from cooperating

25   with the SSO.

26

27   [5] Joseph J. Mueller & Timothy D. Syrett, *The Smartphone Royalty Stack: Surveying Royalty
     Demands for the Components within Modern Smartphones* (May 29, 2014),
28   https://www.wilmerhale.com/pages/publicationsandnewsdetail.aspx?NewsPubId=171798724
     41.

1    32.    The TIA has explained this point[6]:

2         Market-driven **Open Standards** can help promote competition and
3         innovation. Such standards are developed or ratified through a
         voluntary, open and consensus-based process.

4         This process is defined by flexible policies that balance incentives to
5         participate in and contribute to the formulation of standards. This
         process benefits users and consumers by the broad implementation of
6         the resulting standards. One element of a voluntary, open and
         consensus-based process addresses the inclusion of patented
7         technologies. The patent policies of standards organizations typically
         find a balance among differing interests. For example, implementers
8         need to access and use patented technology included in the standard.
9         Patent holders need to preserve their rights in a way that encourages
         them to contribute their innovative solutions to the standardization
10        effort. "RAND" patent policies seek to provide this type of balance by
         helping to make that patented technology available to all on
11        "reasonable and non-discriminatory" (i.e., RAND) terms and
12        conditions.

13    33.    As the United States Court of Appeals for the Third Circuit has also noted in a

14   case against Qualcomm:

15        [A] standard, by definition, eliminates alternative technologies. When
         a patented technology is incorporated in a standard, adoption of the
16        standard eliminates alternatives to the patented technology. Although
         a patent confers a lawful monopoly over the claimed invention, its
17        value is limited when alternative technologies exist. That value
         becomes significantly enhanced, however, after the patent is
18        incorporated in a standard. Firms may become locked in to a standard
19        requiring the use of a competitor's patented technology. The patent
         holder's [intellectual property rights], if unconstrained, may permit it
20        to demand supracompetitive royalties. It is in such circumstances that
         measures such as FRAND commitments become important safeguards
21        against monopoly power.

22   *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 314 (3d Cir. 2007) (citations omitted).

23    34.    When a SEP holder makes a FRAND promise to a SSO, implementers of the

24   standard and their customers are third-party beneficiaries of that promise. FRAND

25   obligations are more than a matter of a private contract between owners of technology, on the

26

27   ---
     [6] TIA, *Approved 20 June 2008 by the Intellectual Property Rights Standing Committee of the
28   TIA; TIA – A Leading Developer of Open Standards*, tiaonline.org (June 20, 2008),
     http://www.tiaonline.org/standards/about/documents/TIA-IPR_20080620-
     003_TIA_OPEN_STANDARDS-CLEAN_R4.pdf.

1    one hand, and SSOs and their other members (and implementers of the standard as intended

2    third party beneficiaries), on the other.  Instead, they are a critical precondition for antitrust

3    tolerance of the industry collaboration on which standard-setting depends.

4    **B.  The Cellular Industry and Qualcomm's Dominance and Abuse of Power.**

5    35.    Wireless standards have evolved in distinct generations, as consumers

6    demanded more features and the industry responded by developing new innovations.  The

7    following graphic, created by Qualcomm, shows the evolution of this technology.[7]



14   36.    For purposes of this case, following the first generation of cellular technology,

15   the cellular industry developed second generation ("2G") cellular technology, from which two

16   primary technology paths, or families of standards, emerged: (1) CDMA, which stands for

17   "Code Division Multiple Access" and (2) "GSM," which stands for "global system for

18   mobility."  CDMA is a channel access method used by various radio communication

19   technologies.  It provides multiple accesses, where several transmitters can send information

20   simultaneously over a single communication channel.  CDMA is used as the access method in

21   many mobile phone standards.  GSM is another access method that is widely used in Europe

22   and much of Asia, other than Japan and South Korea.  It utilizes a variation of time division

23   multiple access.  Wireless network carriers operated under one or the other path, with, for

24   example, Verizon and Sprint operating CDMA-path networks, while AT&T (formerly

25   Cingular) and T-Mobile operated GSM-path networks.  The CDMA and GSM technology

---

[7] Qualcomm, *The Evolution of Mobile Technologies-1g-2g-3g-4g-lte*, (June 2014),
https://www.qualcomm.com/media/documents/files/the-evolution-of-mobile-technologies-1g-to-2g-to-3g-to-4g-lte.pdf.

CLASS ACTION COMPLAINT

1    paths are not interoperable; in other words, equipment and technologies designed to be

2    compatible with one standard cannot be used for the other standard.

3         37.    Mobile devices are configured for a particular carrier, like AT&T or Verizon,

4    and thus chipsets designed for a particular wireless device must conform to the standard

5    technology chosen for the carrier's associated network.  In other words, CDMA-based

6    networks demand chipsets that conform to the CDMA standard, and GSM networks require

7    chipsets that conform to the GSM standard.  As a result, chipsets that comply with a given

8    standard are not substitutes for chipsets that comply with other standards.  These chipsets

9    likewise have different price and demand characteristics.  Downstream consumers purchase

10   cell phones that include chipsets configured to operate using the standards chosen for a

11   particular network, and once purchased, those consumers are inextricably tied to that standard

12   for use of that device.

13        38.    Qualcomm pioneered the development of CDMA.  As a result, it controlled,

14   and continues to control, the market for such technology, initially selling 90% of the CDMA-

15   chipsets and continuing to control over 80% of the market.  Additionally, Qualcomm amassed

16   many patents related to this standard.  Consequently, virtually any company that makes

17   CDMA-based products—be they chipsets, phones, or infrastructure gear—has to obtain a

18   license from Qualcomm.  Licensees pay a one-time fee for access to the patent portfolio and

19   then royalties based on the final product sold by the licensee (*e.g.*, a smartphone).  Nearly all

20   cellular companies have signed patent licenses with Qualcomm.

21        39.    Qualcomm's royalty stream has continued in the technologies standardized in

22   third generation ("3G") cellular technology.  As with the prior generation of cellular

23   technology, 3G evolved into two competing standards—but this time, *both* major standards

24   were based on CDMA.  While an improved version of CDMA technology was developed, the

25   Universal Mobile Telecommunications Service ("UMTS") standard was also developed.

26        40.    UTMS uses radio technology called WCDMA, which stands for "Wideband

27   Code Division Multiple Access."  WCDMA technology allows for even further increased data

28   speed and capacity. The UMTS standard was adopted by SSOs in the United States and

CLASS ACTION COMPLAINT

1    elsewhere after evaluating alternative available technologies.  Qualcomm supplies some of the

2    essential technology that ETSI included in the UMTS standard and holds intellectual property

3    rights ("IPRs"), such as patents, in this technology.  Among others, Qualcomm owns the

4    essential patents for the WCDMA standard.

5        41.    Consequently, CDMA-based technology has been adopted for *all* 3G wireless

6    standards throughout the world, and Qualcomm has in turn reaped more than $50 billion in

7    licensing revenues since 2000.  Indeed, Qualcomm charges a royalty on nearly every

8    smartphone made, whether or not the device uses its chips.

9        42.    ETSI and other SSOs required a commitment from vendors whose

10   technologies are included in the CDMA and other CDMA-based standards to license their

11   technologies on FRAND terms.  Qualcomm voluntarily and publicly agreed to accept

12   FRAND obligations, allowing it to license its patent portfolio to more than 155 companies,

13   and making its portfolio the most widely licensed in the industry.

14       43.    Indeed, in 2008, Qualcomm noted that it "has had a long standing policy of

15   broadly offering to license its standards essential patents for CDMA-based

16   telecommunications standards on terms and conditions that are fair, reasonable, and free from

17   unfair discrimination (FRAND), subject to reciprocity."[8]  But in that same press release,

18   Qualcomm publicly stated that "FRAND embodies a flexible approach that allows individual

19   licensors and licensees to negotiate the terms and conditions that are best suited to address

20   their respective commercial objectives" and "FRAND does not, and never has, prescribed

21   formulas for imposing cumulative royalty caps or proportional allocations of such royalty

22   caps."  This public statement was false.  As regulatory actions in multiple countries have

23   confirmed, Qualcomm has not abided by FRAND principles and its interpretation of FRAND

24   is not consistent with the obligations imposed on it by SSOs.  Qualcomm's promises to

25   comply with its FRAND obligations induced the SSOs to adopt its technology in the cellular

26   standards relevant to this action.  That conduct constituted deceit and fraud on the SSOs and

27

28

---

[8] Qualcomm, *LTE/WiMax PATENT LICENSING STATEMENT* (Dec. 2008),
https://www.qualcomm.com/documents/ltewimax-patent-licensing-statement.

CLASS ACTION COMPLAINT

1    has injured Plaintiffs and others that have paid unreasonably high prices for cellular devices

2    as a result of Qualcomm's royalty demands.

3           44.    Qualcomm has abused its power over SEPs and the chipset supply to increase

4    its own dominance in these markets and charge exorbitant royalties.  It has also abused its

5    involvement in the SSOs, which set standards around Qualcomm technology and gave it the

6    means to be as economically powerful as it has become.  Qualcomm's manipulation of this

7    unique position is confirmed by multiple investigations of its conduct by trade and

8    competition agencies around the world, as discussed below.

9           45.    The fourth generation of cellular technology ("4G") brought with it the "LTE"

10   standard, which stands for Long Term Evolution of UMTS.  Nearly all cellular-enabled

11   devices sold today support LTE for 4G service.  LTE is an "orthogonal frequency division

12   multiple access" or "OFDMA"-based technology.  The LTE standard does not implement

13   CDMA-based technologies.

14          46.    But like the UMTS technology before it, the arrival of LTE has not

15   significantly impacted Qualcomm's control over the chipset market or the power of its

16   licensing business.  Qualcomm holds a patent portfolio that applies to LTE technologies,

17   including OFDMA, and over 90 companies (including Apple, LG, Nokia, and Samsung) have

18   royalty-bearing licenses under Qualcomm's patent portfolio for use in OFDMA products

19   (which do not implement any CDMA-based standards).  Additionally, many of the 4G-based

20   cellular devices still implement CDMA-based technology to be backwards-compatible with

21   other CDMA-based technologies that are still in use today.  Qualcomm exclusively supplies

22   multimode CDMA-LTE chipsets that are backward compatible with CDMA.

23          47.    Consequently, with its power over CMDA technology, Qualcomm can and

24   does use this as leverage to gain a greater share of the LTE-chipset market.  The following

25   chart, prepared by the KFTC[9], demonstrates how Qualcomm has used control over CDMA-

26   based technologies to acquire more power and control over the LTE chipset market.

27

28

---

[9] Qualcomm has provided an unofficial translation of the KFTC's press release on its website.
*See* KFTC Issued Press Release Dated December 28, 2016 – Unofficial English Translation,

CLASS ACTION COMPLAINT

**&lt;Qualcomm's Market Share Trend in Modem Chipset Market per Standard (Based on Revenues)&gt;**

|        | Yr 2008 | Yr 2009 | Yr 2010 | Yr 2011 | Yr 2012 | Yr 2013 | Yr 2014 | Yr 2015 |
|--------|---------|---------|---------|---------|---------|---------|---------|---------|
| LTE    | -       | -       | 34.2%   | 58.8%   | 94.5%   | 96.0%   | 84.8%   | 69.4%   |
| CDMA   | 98.4%   | 97.6%   | 96.4%   | 94.3%   | 92.4%   | 93.1%   | 91.6%   | 83.1%   |
| WCDMA  | 38.8%   | 47.4%   | 45.7%   | 55.0%   | 50.4%   | 53.9%   | 48.8%   | 32.3%   |

\* Source: Strategy Analytics

48.    In sum, Qualcomm holds a dominant position in the supply of chipsets that support CDMA, on which devices sold by Verizon and Sprint continue to depend.  It also holds a dominant position over the LTE-chipset supply.  Qualcomm has had a share of at least 80% or more of the CDMA chipset market for many years, and Qualcomm's share of the LTE chipsets market was above 90% between 2012 and 2014, and remains close to 70% today.  Qualcomm has leveraged its monopoly power over the supply of these chipsets to force device manufacturers into anticompetitive license agreements.  In other words, because these companies need CDMA- and LTE-based chipsets (controlled by Qualcomm) to be able to operate with CDMA- and LTE-based networks, Qualcomm has coerced device manufactures into accepting unreasonable and one-sided license terms dictated by Qualcomm.  As one commentator noted: "Qualcomm's status as both a chipset and IP vendor provides them with unparalleled leverage to collect licensing fees at a lower cost, simply by denying physical delivery of the chipsets until all fees are paid."[10]

49.    In its complaint, the FTC referred to this as the "no license, no chips" policy and said Qualcomm's "anomalous" position set it apart from other SEP holders in the industry.  As the FTC pointed out, this policy compelled potential SEP licensees to accept Qualcomm's terms and effectively precluded them from seeking judicial determinations of what an appropriate FRAND rate would be.  An example of such a determination is provided by *Microsoft Corp. v. Motorola, Inc.*, No. C10-1823JLR, 2013 WL 2111217 (W.D. Wash.

---

https://www.qualcomm.com/documents/kftc-issued-press-release-dated-december-28-2016-unofficial-english-translation (last visited Jan. 15, 2017).

[10] Richard A. Taddonio, *Long – Qualcomm (NASDAQ: QCOM) - $68.42*, Columbia Business School 2015, https://www8.gsb.columbia.edu/valueinvesting/sites/valueinvesting/files/Taddonio_Richard-QCOM_0.pdf (last visited Jan. 16, 2017).

April 25, 2013), *aff'd*, 795 F.3d 1024 (9th Cir. 2015).  There, the SEP holder sought $6-$8 as a royalty rate for each gaming console manufactured by the plaintiff, and the district court, after a bench trial, ruled that the FRAND rate was only four cents per console.  The United States Court of Appeals for the Ninth Circuit upheld this determination, stating:

> The framework settled on [for making a FRAND determination] was "generally [consistent] with Motorola's approach." Applying that approach, the district court sought to approximate the royalty rates upon which the parties would have agreed by setting up a hypothetical negotiation between the parties. In doing so, the court carefully thought through the "factors an SEP owner and implementer would consider" in an actual negotiation directed at licensing a patent subject to RAND commitments. The court then discussed each of Motorola's fifteen H.264 patents and eleven 802.11 patents, considering the objective value each contributed to each standard, given the quality of the technology and the available alternatives as well as the importance of those technologies to Microsoft's business. Finally, the court performed a meticulous analysis of the testimony of eighteen witnesses, including executives, economists, and technology experts, to sort out which evidence to rely upon in determining the RAND royalty rate. Generally, the court credited Motorola's experts; where it did not, it provided reasoned explanations for not doing so.

795 F.3d at 1040 (first edit added; other edits in original).[11]

50.  Qualcomm also holds a dominant position in the SEP licensing market. Qualcomm has declared thousands of its patents as essential to CDMA, UMTS (WCDMA), and LTE standards.  Consequently, device and device component manufacturers are highly reliant on Qualcomm's SEPs, as each CDMA-, UMTS-, and/or LTE-related SEP is indispensable and irreplaceable for such manufacturers.  Qualcomm thus controls the licensing market for SEPs for CDMA, UMTS (WCDMA), and LTE technologies because manufacturers could not produce 3G and 4G devices without risking Qualcomm's initiating patent infringement lawsuits or seeking injunctions.

---

[11] *See also Realtek Semiconductor Corp. v. LSI Corp.*, No. C-12-3451-RMW, 2014 WL 2738226, at *6 (N.D. Cal. Aug. 16, 2014) ("The court hereby enters declaratory judgment that, upon Realtek's request for a license, to be in compliance with its RAND commitment, LSI must offer Realtek a license to the '958 Patent on RAND terms, including a royalty rate of 0.12% on the total sales of Realtek's products.").

51.     Qualcomm also uses its SEPs to require device and device component manufacturers and others to license its entire patent portfolio, which includes non-SEPs as well.  Non-SEPs refer to the patents that are either not essential to the realization of the standard or replaceable in their functionalities through design-around or avoidance design. There is no requirement that non-SEPs be licensed on FRAND terms.  By putting both SEPs and non-SEPs into one license, Qualcomm avoids its obligation to set license terms on a FRAND basis.  In doing so, Qualcomm can charge exorbitant royalties to any licensees that were forced to accept the packaged patent licenses.

52.     Qualcomm's licensing division brings in the vast majority of its profits, as illustrated in the graph below.  As such, it is critical for Qualcomm to maintain its licensing and related terms which have made it so profitable.



53.     Qualcomm has structured its business to maintain that licensing power.  In 2007, Qualcomm claimed publicly that any manufacturers using CDMA and UMTS/WCDMA technology "ha[s] to take out a license from Qualcomm" and that Qualcomm had been "pretty consistent in that model."[12]

_____

[12] Qualcomm, Inc. at Jefferies Technology Conference (Oct. 2, 2007), at 5.

CLASS ACTION COMPLAINT

54.     Again in 2007, Qualcomm filed an *amicus* brief to the United States Supreme Court in which it described its licensing business model as follows:[13]

> Qualcomm has provided chipmakers nontransferable, worldwide, nonexclusive, restricted licenses to its portfolio of technically necessary patents through licensing agreements called ASIC [Application Specific Integrated Circuits] Patent License Agreements ("APLAs").  Chipmaker licensees typically pay Qualcomm an up-front license fee and a running royalty (paid quarterly) that is an agreed upon percentage of the defined Net Selling Price of the chips produced by the licensee. . . .  An APLA provides the chipmaker-licensee with a license to *make* (or have made) its own ASICs.  An APLA also provides the chipmaker-licensee with a restricted license to *sell* ASICs, but only to handset makers that the APLA defines to be an "Authorized Purchaser" for incorporation into fully assembled handsets.  Authorized Purchasers are those handset makers that themselves have a license from Qualcomm through their own Subscriber Unit License Agreement ("SULA") to make, use and sell fully assembled handsets that, in the absence of a SULA, would infringe Qualcomm's patents.  Importantly, by their express terms, APLAs do *not* grant a license to the chipmaker to *use* the ASICs—i.e., licensed chipmakers may not themselves use or  pass on to others the right to use the chipmaker's ASICs to make, operate or sell handsets or any other product.  APLAs explicitly state that the rights to use the ASICs to make, operate or sell handsets are only conferred by licensing agreements between Qualcomm and Authorized Purchasers (i.e., by SULAs).  APLAs also expressly state that the license granted is only for the limited scope laid out, that no other license is granted or implied and that if the chipmaker-licensee sells ASICs to entities that are not Authorized Purchasers, the licensee has materially breached the APLA, which gives Qualcomm the right to terminate the agreement, including the license granted.

> As previously mentioned, producers of chips that are licensed through APLAs are granted, *inter alia*, a license to sell such chips only to handset makers that have entered into a SULA with Qualcomm.  The standard terms of the SULAs have granted handset makers a nontransferable, worldwide, nonexclusive, unrestricted license to Qualcomm's patents to *make* (and have made), import and *use* handsets, and to *sell* (and offer to sell) completed handsets.  SULAs typically provide for an up-front licensing fee to be paid to Qualcomm, along with a running royalty (paid quarterly) that is set as a percentage of the Net Selling Price of the handsets sold.

---

[13] Br. of Qualcomm Inc. as Amicus Curiae Supporting Respondent, *Quanta Comp., Inc. v. LG Elecs., Inc.*, 533 U.S. 617 (2008) (No. 06-937), at 7-9.

55.     Even where Qualcomm sells its own chips, it requires purchasers to agree to its license agreements (as the FTC also noted)—which include the royalty rate based on the selling price of the device.  As Qualcomm explained in its amicus brief:

> Qualcomm is also in the business of developing and selling its own chips and software for wireless handsets. Qualcomm typically sells chips only to those handset manufacturers that are licensed to Qualcomm's patents under a SULA. Such chip sales are pursuant to Components Supply Agreements, in which handset makers agree to pay Qualcomm an agreed upon price for the chips sold by Qualcomm. Components Supply Agreements provide that the buyer-handset makers may only incorporate the chips purchased from Qualcomm into fully assembled handsets that are the subject of the SULA.

Essentially, cellular devices today are unable to connect to their network without paying a royalty (between 3-5% of the price of the entire device) to Qualcomm.[14]

56.     In short, the KFTC correctly identified three of Qualcomm's abusive and anticompetitive practices.  *First*, it did not provide SEP licenses to competing chipset companies while threatening to sue them under those patents if they compete against Qualcomm in the sale of chipsets.  *Second*, in selling chipsets to device and device manufacturers, Qualcomm demanded the execution and performance of its license agreements, thus leveraging its SEPs improperly.  And as a result, *third*, QTL coerced cellular phone makers to accept unilateral onerous terms.

57.     The KFTC depicted this conduct in the graphic below.[15]

---

[14] *See also* Subscriber Unit License Agreement, SEC.gov, https://www.sec.gov/Archives/edgar/data/1092492/000119312504140764/dex103.htm (last visited Jan. 16, 2017).

[15] *See supra* note 9.



58.     Qualcomm's policy of not licensing SEPs to competing chipset makers while insisting on licensing from cellular device manufacturers has entrenched its market power.

59.     Additionally, as device manufacturers cannot purchase chipsets from Qualcomm's competitors without also paying royalties to Qualcomm, to avoid such royalties, in some cases they agree to deal exclusively or near-exclusively with Qualcomm on the purchase of chipsets.  As the FTC explained in its recently-filed complaint, since 2007, Apple has entered into agreements to deal exclusively with Qualcomm in exchange for partial relief from Qualcomm's standard royalties.  Samsung has also entered into a similar exclusive dealing arrangement with Qualcomm.[16]  Qualcomm's exclusive supply arrangements with these device manufacturers denies other modem chipset suppliers the benefits of working with those manufacturers and hampers their development into effective competitors.

---

[16] Joel Hruska, *Qualcomm may have inked exclusive deal to put Snapdragon 820 in Samsung hardware*, ExtremeTech.com (Dec. 21, 2015) https://www.extremetech.com/mobile/219791-qualcomm-may-have-inked-exclusive-deal-to-put-snapdragon-820-in-samsung-hardware.

CLASS ACTION COMPLAINT

60.     As the KFTC explained, the size of the modem chipset market doubled since 2008, but Qualcomm's licensing practices caused no significant competitor to enter the market and rather caused many existing competitors to exit it[17]:



<Market Growth Trend in the Modem Chipset Market and Market Exit by Major Chipset Companies>

| Modem Chipset Maker | Exit (Imminent) Time |
|---|---|
| NXP | August 2008 |
| TI | October 2008 |
| Freescale | October 2008 |
| ST Micro | February 2012 |
| NEC | February 2014 |
| Broadcom | June 2014 |
| Ericsson | September 2014 |
| Nvidia | May 2015 |
| Marvell | September 2015 |

61.     The result has been a steady increase in Qualcomm's share of the chipset market.[18]

62.     This dominance in the chipset market, coupled with its ownership of critical SEPs built into several of the standards adopted by various SSOs, allowed Qualcomm to

---

[17] *See supra* note 9.

[18] *Id.*

CLASS ACTION COMPLAINT

1  impose onerous license terms on device manufacturers, including exorbitant royalties that

2  were not the result of the FRAND process.

3       63.     Qualcomm's royalty rates of 5% for most CDMA-based products and 3.25%

4  for more recent LTE-based products are significantly higher than others in the industry.  The

5  following chart demonstrates this in the LTE context as of 2010:

| Company | Announced LTE Rates | No. of Essential LTE Patents |
|---|---|---|
| 1. Qualcomm | 3.3% | 350 |
| 2. Huawei | 1.5% | 182 |
| 3. Ericsson | 1.5% | 146 |
| 4. Nokia | 1.5% | 142 |
| 5. Nortel | 1.0% | 46 |
| 6. Siemens | 0.8% | 32 |
| 7. Motorola | 2.3% | 16 |
| 8. Alcatel | 2.0% | 9 |

**Source:** Stasik, Eric, "Royalty Rates and Licensing Strategies for Essential Patents on LTE (4G) Telecommunication Standards," *les Nouvelles*, September 2010, p. 116.

13       64.     Qualcomm's rate base is also part of what makes Qualcomm's royalties so

14  abusive.  Qualcomm admits that its "[r]oyalties are generally based upon a *percentage of the*

15  *wholesale (i.e., licensee's) selling price of complete licensed products*, net of certain

16  permissible deductions (including transportation, insurance, packing costs and other items)."

17  (Emphases added).  Using the entire value of an end product is not a reasonable basis for

18  calculating SEP-based royalties.  As Apple has pointed out in its complaint, that rate base is

19  calculated as a percentage of the value that Apple's own research, development, and

20  innovation created in successive generations of iPhones.  Indeed, around February 8, 2015,

21  the IEEE updated its licensing policy, stating that a reasonable royalty should be the value

22  attributable to a SEP, excluding the value of that SEP's inclusion in an IEEE standard, and

23  that a factor to consider when determining the reasonable rate is the value of the relevant

24  functionality of the smallest salable compliant implementation that practices the essential

25  patent claim.[19]  Qualcomm's power and leverage allows it force licensees to pay excessive

---

[19] Deepa Sundararaman, *Inside The IEEE's Important Changes To Patent Policy*, Law360 (Apr. 3, 2015), https://www.law360.com/articles/637457/inside-the-ieee-s-important-changes-to-patent-policy.

1    rates on an unreasonable rate basis, which results in a royalty divorced from the actual value

2    attributable to its technologies.

3        65.    Qualcomm realizes the benefits of maintaining its licensing business and

4    chipset business in one company and has rejected a push from an activist investor hedge fund

5    to split the businesses into two companies.  "The strategic benefits of the current structure will

6    best fuel Qualcomm's growth as we move through the upcoming technology transitions and

7    extend our technologies into new user experiences, services and industries," said Qualcomm's

8    CEO, Steve Mollenkopf.[20]

9        66.    The Apple complaint highlights another issue regarding Qualcomm's conduct.

10   Apple states at paragraph 93 of the complaint that "[s]pecifically, since 2011, Qualcomm has

11   conditioned billions of dollars in rebates on exclusivity or de facto exclusivity from Apple.

12   The monopoly power that Qualcomm enjoys today in the market for premium LTE chipsets is

13   directly related to Qualcomm's foreclosure of Apple's business to actual and potential

14   competitors in the premium LTE chipset market."[21]  Apple made a submission to the KFTC

15   in opposition to Qualcomm, and it notes at paragraph 160 of its complaint that "in restraining

16   Apple from initiating action or bringing concerns to law enforcement, Qualcomm conditioned

17   billions of dollars on Apple's silence before courts and regulators about Qualcomm's business

18   practices. And Qualcomm is now interpreting that agreement to retaliate against Apple for

19   responding to requests for information about Qualcomm's practices from competition

20   agencies, inhibiting law-enforcement review of Qualcomm's anticompetitive practices."

21   **C.  Regulators Investigate and Penalize Qualcomm's Abusive Conduct**

22       67.    While Qualcomm's abusive and unfair licensing practices have allowed it to

23   rake in billions of dollars in undeserved profits, these practices have not gone unnoticed.  In

24

25   _____

     [20] Mike Freeman, *Qualcomm Rejects Breakup Plan*, Los Angeles Times (Dec. 15, 2015),
26   http://www.latimes.com/business/la-fi-qualcomm-20151215-story.html.

27   [21] This alone was arguably inconsistent with Qualcomm's FRAND promise to SSOs.  *See In
     re Innovatio IP Ventures, LLC Patent Litig.*, No. 11 C 9308, 2013 WL 5593609, at *38 (N.D.
28   Ill. Oct. 3, 2013) (a FRAND licensor "cannot discriminate between licensees on the basis of
     their position in the market").

CLASS ACTION COMPLAINT

1    the last few years, Qualcomm's royalty and licensing practices have come under scrutiny by

2    competition regulators from China, South Korea, Taiwan, Japan, Europe, and the United

3    States.  As described below, competition law enforcement authorities around the world have

4    concluded that Qualcomm's conduct as alleged herein is anticompetitive, unfair, and injurious

5    to consumers.

6           68.     For example, in November 2013, China's NDRC began to investigate

7    Qualcomm's SEP licensing practices.[22]  On February 10, 2015, the NDRC found Qualcomm

8    (1) controlled the SEP Licensing Market and the CDMA, WCDMA, and LTE baseband chip

9    markets, and (2) abused that dominance by, among other things, charging excessive and

10   unfairly high royalties to licensees that were "forced" to accept the packaged patent licenses.

11   The NDRC found Qualcomm's conduct constituted violations of provisions of the China

12   Anti-Monopoly Law and, among other things, imposed a $975 million fine.[23]  It also ordered

13   Qualcomm to materially lower the effective royalty by calculating its royalty not based on the

14   total wholesale price of the device, but by calculating its royalty at 65% of the net selling

15   price.[24]

16          69.     In July of 2009, the KFTC fined Qualcomm for abusing its dominant shares of

17   the chipset market and the SEP license market.[25]  The $207 million fine was the largest the

18   KFTC had then ever imposed on a company.  Undeterred by this fine, Qualcomm doubled

19   down on its unlawful conduct.  In December of 2016, the KFTC issued a decision imposing

20

21   _____

     [22] H. Stephen Harris, Jr., *An Overview of the NDRC Decision in the Qualcomm Investigation*

22   *July 2015*, CPI Antitrust Chronicle (July 2015), available at
     http://www.winston.com/en/thought-leadership/an-overview-of-the-ndrc-decision-in-the-

23   qualcomm-investigation.html.

24   [23] Qualcomm Press Release, *Qualcomm and China's National Development and Reform*
     *Commission Reach Resolution* (Feb. 9, 2015),

25   https://www.qualcomm.com/news/releases/2015/02/09/qualcomm-and-chinas-national-
     development-and-reform-commission-reach.

26   [24] *See supra* note 22.

27   [25] *See* Yoonhee Kim & Hui-Jin Yang, *A Brief Overview of Qualcomm v. Korea Fair Trade*
     *Commission*, CPI Antitrust Chronicle, (Mar. 2015)

28   https://www.competitionpolicyinternational.com/assets/Uploads/KimYangMar-151.pdf.

its largest fine for Qualcomm's monopolistic conduct and mandating changes to Qualcomm's business model.  Among other things, the KFTC found Qualcomm had coerced patent license agreements from device manufacturers while holding hostage the supply of chipsets.  In other words, "Qualcomm actually used the threat of terminating the supply of modem chipsets as **negotiation leverage** in the process of license negotiations with handset companies." (Emphases in original).[26]  The KFTC found that Qualcomm's control over the chipset market makes it so "handset companies have to bite the bullet and accept Qualcomm's license terms, even if they are unfair, because if the modem chipset supply is suspended, handset companies would face the **risk** of their **entire business** shutting down."  (Emphases in original).[27]

70.     Similarly, the European Commission ("EC") notified Qualcomm of its investigation in October of 2014.  The EC issued a Statement of Objections against Qualcomm in December of 2015, which alleged that Qualcomm's practices harmed chipset competition and innovation.  Also, in December 2015, the Taiwan Fair Trade Commission ("TFTC") notified Qualcomm of its investigation into the company's licensing behavior and among other things, whether Qualcomm's royalty charges are unreasonable.

71.     Most recently, the United States FTC on January 17, 2017, filed an enforcement action in this Court seeking a permanent injunction against Qualcomm to undo and prevent its unfair methods of competition in violation of Section 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45(a).  The FTC alleges, among other things, that (1) Qualcomm withholds its baseband processors unless a customer accepts a license to standard-essential patents on terms preferred by Qualcomm, including elevated royalties; (2) Qualcomm has consistently refused to license its cellular standard essential patents to its competitors, in violation of Qualcomm's FRAND commitments; and (3) Qualcomm entered into exclusive dealing arrangements with Apple, which denied other baseband processor suppliers the benefits of working with a particularly important cell phone manufacturer and hampered their development into effective competitors.  *Id.*

---

[26] *See supra* note 9.

[27] *Id.*

**D.   Consumers are Harmed as a Direct Result of Qualcomm's Conduct**

72.    Qualcomm has abused its monopoly power to force device manufacturers and other licensees to pay excessively high royalties, which has directly resulted in harm to Plaintiffs and members of the proposed classes because it resulted in them paying higher prices for their cellular devices than they would have in the absence of Qualcomm's conduct.

73.    Cellular devices are commodity products that consumers purchase as stand-alone products.  Consumers typically buy cellular devices either from the device manufacturer, such as Samsung or Apple, or through their network carrier, such as Verizon or Sprint.

74.    Device manufacturers and network carriers are subject to vigorous price competition, and as a result, they do not absorb Qualcomm's unlawful royalties, which are based on a percentage of the wholesale cost of the device itself.  Instead, they pass along some, or all, of the excessive royalty to consumers.  For instance, baseband processors cost as little as $10 to $13, but royalty demands associated with this component approach $60 for a $400 smartphone.[28]  This disparity between royalty demands and component costs results in increased costs for cellular devices, which are directly passed on to the consumer.

75.    Plaintiffs and members of the proposed classes have been forced to pay supra-competitive prices for cellular devices.  As Qualcomm bases its royalties on a percentage of the wholesale selling price of a complete licensed product, purchasers of cellular devices are only one level removed from the unlawful overcharge at issue here.  Accordingly, this case will not involve complicated pass-through analysis in multiple and complex distribution chains.  *In Re: Graphics Processing Units Antitrust Litig.*, 540 F. Supp. 2d 1085, 1098 (N.D. Cal. 2007).

76.    Economic and legal scholars have recognized that unlawful overcharges of a component normally result in such pass-through costs.  Two antitrust scholars – Professors

---

[28] *See supra* note 2; *see also* Nomura 2012 Smartphone Guide http://www.patentoday.com/wp-content/uploads/2014/08/nomura_smartphone_poster_2012.pdf (last visited Jan. 15, 2017),

1    Robert G. Harris (Professor Emeritus and former Chair of the Business and Public Policy

2    Group at the Haas School of Business at the University of California at Berkeley) and the late

3    Lawrence A. Sullivan (Professor of Law Emeritus at Southwestern Law School and author of

4    the *Handbook of the Law of Antitrust*) – have observed that "in a multiple-level chain of

5    distribution, passing on monopoly overcharges is not the exception: it is the rule."[29]

6    Similarly, Professor Jeffrey K. MacKie-Mason (Arthur W. Burks Professor for Information

7    and Computer Science and Professor of Economics and Public Certification), an economist

8    who presented evidence in a number of indirect purchaser cases, said:

9

10

11

12

> As is well known in economic theory and practice, at least some of the overcharge will be passed on by distributors to end consumers. When the distribution markets are highly competitive, as they are here, all or nearly the entire overcharge will be passed on through to ultimate consumers . . . . This general phenomenon of cost pass through is well established in antitrust laws and economics as well.

13      77.    The FTC concurs in its complaint. It states at paragraph 1 of its complaint that

14    "Qualcomm has engaged in exclusionary conduct that taxes its competitors' baseband

15    processor sales, reduces competitors' ability and incentive to innovate, and raises prices paid

16    by consumers for cell phones and tablets." Likewise, at paragraph 63 of its complaint, the

17    FTC says that "[t]he policy skews Qualcomm's license negotiations with OEMs [Original

18    Equipment Manufacturers] toward outcomes that raise the all-in prices that OEMs must pay

19    on both Qualcomm baseband processors and those supplied by Qualcomm's competitors.

20    These higher all-in prices reduce demand for competitors' processors and raise handset prices

21    paid by consumers." Similarly, at paragraph 87 of its complaint, the FTC observed that "[t]he

22    incremental royalty that OEMs pay to Qualcomm operates as a 'tax' that raises OEMs' costs

23    of using baseband processors supplied by Qualcomm's competitors, reduces demand for

24    competitors' processors, and reduces the ability and incentive of competitors to invest and

25    innovate. The tax thereby maintains Qualcomm's monopoly power and raises handset prices

26    paid by consumers." And at paragraph 95 of its complaint, the FTC noted that as a result of

27

28

---

[29] RG Harris & LA Sullivan, *Passing-On the Monopoly Overcharge: A Comprehensive Policy Analysis*, 128 U. PA. L. REV. 269, 276 (1979).

1    this "tax," "OEMs likely pass some portion of these higher prices on to consumers in the form

2    of higher handset prices or reduced handset features."

3         78.    If Qualcomm was forced to stop abusing its monopoly power and charge a fair

4    and reasonable royalty, consumers would receive better prices when purchasing cellular

5    devices.

6         79.    The precise amount of the overcharge impacting the prices of cellular devices

7    purchased by consumers is measureable through commonly accepted statistical and regression

8    modeling.

9    **VI.    MARKET DEFINITION**

10        80.    The relevant geographic market for purposes of this action is the United States

11   and its territories.

12        81.    The relevant product markets are: (1) the market for CDMA-based and

13   premium LTE modem chipsets ("Modem Chipset Market"), also known as baseband

14   processors, which allow cellular devices to communicate with wireless networks and

15   (2) intellectual property rights associated with SEPs ("SEP Licensing Market").  These two

16   products – modem chipsets and SEP licenses – will be referred to collectively as the "Cellular

17   Device Components" as both SEPs and modem chipsets are necessary components of the

18   relevant cellular devices in this case which implement CDMA-based and/or premium LTE

19   technologies (hereafter, the "Relevant Cellular Devices")

20        82.    Qualcomm directly participates in the market for the sale of the Relevant

21   Cellular Devices to Plaintiffs and proposed class members by encumbering those devices

22   through its licenses and related royalties.  Specifically, Qualcomm's royalty payments are

23   calculated as a percentage of the wholesale price of the Relevant Cellular Devices, which in

24   turn increases the retail price of those devices.  In other words, Qualcomm licenses

25   technology essential to the operation of cellular devices and obtains monopoly rents tied

26   directly to the entire wholesale price of the Relevant Cellular Devices.  The effect of

27   Qualcomm's anticompetitive conduct is thus targeted at the cellular device as a whole and not

28   components thereof.  Accordingly, because Qualcomm royalties are based on the wholesale

selling price of complete licensed products, the patent rights owned by Qualcomm are inextricably intertwined with the Relevant Cellular Devices themselves.  As a result, Qualcomm's anticompetitive acts, as alleged herein, directly distorted the price of the Relevant Cellular Devices paid by Plaintiffs.

83.    Relatedly, Plaintiffs may not use the Relevant Cellular Devices without the licenses provided by Qualcomm.  In the absence of the licenses, as recognized by federal courts, Qualcomm has standing to sue any indirect users—not just direct infringers—of cellular devices infringing on its patent rights.

84.    Plaintiffs' injuries are also inextricably intertwined with Qualcomm's anticompetitive conduct with respect to modem chipsets and abuse of patent rights because it has increased the cost to them of purchasing the Relevant Cellular Devices by, among other things, (1) eliminating competition, (2) allowing Qualcomm to charge supracompetitive prices for its chipsets and licenses, and (3) forcing device manufacturers to agree to onerous licensing terms (with unreasonable royalties).

## VII.    CLASS ACTION ALLEGATIONS

85.    Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(2), of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief, as well as under Rule 23(b)(3) for monetary relief under California law, on behalf of the following class (the "Nationwide Class"):

> All persons and entities in the United States who purchased, paid and/or provided reimbursement for some or all of the purchase price for CDMA-based and/or premium LTE cellular devices ("Relevant Cellular Devices") from January 17, 2013 through the present.  This class excludes: (a) Defendant, its officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal and state governmental entities except for those who have purchased Relevant Cellular Devices; (c) all persons or entities who purchased Relevant Cellular Devices for purposes of resale or directly from Defendant; (d) any judges or justices involved in this action and any members of their immediate families or their staff.

86.    Alternatively to the claim for nationwide monetary relief under California law, Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a)

1    and (b)(3) of the Federal Rules of Civil Procedure seeking damages or monetary relief

2    pursuant to the common law of unjust enrichment and individual state antitrust, unfair

3    competition, and consumer protection laws for each of the states listed below (the "Indirect

4    Purchaser States")[30] on behalf of the following class (the "Damages Class"):

> All persons and entities in the United States who purchased, paid and/or
> provided reimbursement for some or all of the purchase price for
> CDMA-based, and/or premium LTE cellular devices ("Relevant
> Cellular Devices") from January 17, 2013 through the present.  This
> class excludes: (a) Defendant, its officers, directors, management,
> employees, subsidiaries, and affiliates; (b) all federal and state
> governmental entities except for those who have purchased Relevant
> Cellular Devices; (c) all persons or entities who purchased Relevant
> Cellular Devices for purposes of resale or directly from Defendant; (d)
> any judges or justices involved in this action and any members of their
> immediate families or their staff.

87.    The Nationwide Class and the Damages Class are referred to herein as the

"Classes."

88.    While Plaintiffs do not know the exact number of the members of the Classes,

Plaintiffs believe there are millions of members in each Class.

89.    Common questions of law and fact exist as to all members of the Classes.  This

is particularly true given the nature of Qualcomm's conduct to acquire and maintain

monopoly power, which was and is generally applicable to all the members of both Classes,

thereby making appropriate relief with respect to the Classes as a whole.  Such questions of

law and fact common to the Classes include, but are not limited to:

- Whether Qualcomm possessed monopoly power over the Cellular Device
  Components in the United States during the Class Period;

- Whether Qualcomm willfully acquired or maintained monopoly power
  over the Cellular Device Components in the United States during the Class
  Period;

---

[30] The "Indirect Purchaser States" consist of Arizona, Arkansas, California, Colorado, District of Columbia, Florida, Iowa, Kansas, Maine, Michigan, Minnesota, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia and Wisconsin.

- Whether Qualcomm possessed monopoly power in the Modem Chipset Market (a critical market underlying the Cellular Device Components) in the United States during the Class Period;

- Whether Qualcomm attempted to possess monopoly power in the Modem Chipset Market (a critical market underlying the Cellular Device Components) in the United States during the Class Period;

- Whether Qualcomm possessed monopoly power in the SEP Licensing Market (a critical market underlying the Cellular Device Components) in the United States during the Class Period;

- Whether Qualcomm attempted to possess monopoly power in the SEP Licensing Market (a critical market underlying the Cellular Device Components) in the United States during the Class Period;

- Whether Qualcomm tied the sale of its CDMA- and premium LTE- based chipsets to the purchase of license rights to its patent portfolio (including SEPs and non-SEPs);

- Whether Qualcomm tied the sale of its SEPs with the purchase of its non-SEPs;

- Whether Qualcomm's acquisition and maintenance of its monopolies in the Cellular Device Components violated Sections 2 and 3(b) of the Sherman Act, as alleged in the First Claim for Relief;

- Whether Qualcomm's conduct violated California's Cartwright Act, Cal. Bus. & Prof. Code §§ 16700, *et seq*., as alleged in the Second Claim for Relief;

- Whether Qualcomm's conduct violated state antitrust and unfair competition laws, and/or state consumer protection laws, as alleged in the Third and Fourth Claims for Relief;

- Whether Qualcomm unjustly enriched itself to the detriment of the Plaintiffs and the members of the Classes, thereby entitling Plaintiffs and the members of the Classes to disgorgement of all benefits derived by Qualcomm, as alleged in the Fifth Claim for Relief;

- Whether the conduct of Qualcomm, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Classes;

- The effect of Qualcomm's unlawful conduct on the prices of Relevant Cellular Devices sold in the United States and its territories during the Class Period;

- The appropriate injunctive and related equitable relief for the Nationwide Class; and

- The appropriate class-wide measure of damages for the Damages Class.

90.     Plaintiffs' claims are typical of the claims of the members of the Classes, and Plaintiffs will fairly and adequately protect the interests of the Classes.  Plaintiffs and all members of the Classes are similarly affected by Qualcomm's wrongful conduct in that they paid artificially inflated prices for purchased indirectly from Qualcomm.

91.     Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes.  Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes.  Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

92.     The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

93.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

94.     The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendant.

//

//

## VIII.   CLAIMS AND PRAYER FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Monopolization in Violation of Sections 2 and 3(b) of the Sherman Act**

95.      Plaintiffs repeat the allegations set forth above as if fully set forth herein.

96.      Qualcomm's conduct, as alleged herein, constitutes unlawful monopolization of the Cellular Device Components, in violation of Section 2 of the Sherman Act (15 U.S.C. § 2), as well as Section 3(b) of Sherman Act (15 U.S.C. § 3(b)).

97.      General antitrust principles apply to conduct involving intellectual property is the same way that they apply to conduct involving any other form of property.

98.      Market power is the ability profitably to maintain prices above, or output below, competitive levels for a significant period of time.  Monopoly power is the ability to control prices and exclude competition in a given market.  If a firm can profitably raise prices without causing competing firms to expand output and drive down prices, that firm has monopoly power.

99.      Qualcomm has monopoly power in the Modem Chipset Market.  First, it has maintained high and durable market shares in this market.  Qualcomm controls the CDMA chipset supply, historically controlling over 90% of the CDMA modem chipset market, and at the lowest point still controlling 83% of this market.  Qualcomm also controls the Modem Chipset Market for LTE-based chipsets, controlling at relevant times up to 90% of the market, and today over 60% of the market.  Qualcomm still exclusively supplies multimode CDMA-LTE chipsets that are backward compatible with CDMA.  Second, there are substantial barriers to entry.  CDMA- and premium LTE- based technologies are not interchangeable with or substitutable for other technologies, and adherents to these technologies and their related standards have become locked-in.  Qualcomm also controls the patents, including SEPs, underlying CDMA-based technologies, and Qualcomm maintained this monopoly by, among other things, refusing to license to competitors and requiring purchasers of its chipsets to agree to its licenses for its patent portfolio.  Third, and relatedly, Qualcomm's monopoly power is shown by its demonstrated ability to repeatedly force device manufacturers to accept

1    one-sided, unreasonable supply terms.  Among other things, Qualcomm has used its control

2    over the CDMA chipset supply to require purchasers to agree to its license agreements and

3    related terms, including excessively high royalty terms.

4         100.    Qualcomm also has monopoly power over the SEP Licensing Market.  SSOs

5    have selected standards based on technology for which Qualcomm owns the patents (based on

6    the condition that Qualcomm would supply its technology on FRAND terms).  As to market

7    share, Qualcomm holds virtually all of the SEPs—the essential patents—for CDMA standard-

8    based technologies, which underlie virtually all 3G devices and 4G-LTE devices which are

9    3G-compatible.  Qualcomm has licensed its patent portfolio for 3G cellular technologies to

10   more than 200 licensees.  As these patents are "essential" to the particular standards that

11   implement them, other patents and patented technology cannot replace or serve as an

12   alternative for Qualcomm's patents.  Qualcomm's market power over the SEP Licensing

13   Market is further demonstrated by Qualcomm's ability to leverage its control of its patents to

14   force device manufacturers to agree to unfair and unreasonable license agreements and terms,

15   including excessive royalties.  Because these manufacturers need to use Qualcomm's

16   technology for their devices to communicate with the major carrier networks, they are forced

17   to agree to Qualcomm's unfair and unreasonable licensing terms.

18        101.    As indicated, Qualcomm has acquired and maintained of its market power in

19   the Cellular Device Components (based on the modem chipsets and SEPs which underlie and

20   are incorporated into all the Relevant Cellular Devices), and it has done so through

21   anticompetitive means, including, but not limited to excluding competition and demanding

22   non-FRAND terms from licensees.

23        102.    Qualcomm thus holds market power over the Cellular Device Components

24   because it can encumber Relevant Cellular Devices with a royalty of its choice without other

25   firms competing to drive down these prices.  Specifically, Qualcomm's control over the

26   Cellular Device Components has allowed it to force license agreements on its competitors and

27   devices manufacturers, and those licenses allow Qualcomm to charge royalties of between

28   three to five percent (3-5%) of the wholesale price of the completed device.  In other words,

CLASS ACTION COMPLAINT

1   each Relevant Cellular Device sold with or based on Qualcomm technology is also

2   encumbered by Qualcomm's excessive royalties, which in turn increase the cost of the device

3   for consumers like Plaintiffs and members of the proposed Classes.

4          103.   There is no procompetitive justification for the anticompetitive conduct in

5   which Qualcomm has engaged.  Qualcomm induced SSOs to use its technology and related

6   patents in setting their standards on the promise that it would adhere to FRAND obligations.

7   In doing so, other alternative (and potentially superior) technologies were not utilized by

8   SSOs.  But Qualcomm has not met its FRAND obligations, and instead, has abused its

9   monopoly power over the Cellular Device Components to force device manufacturers into

10  licenses with unfair and unreasonable terms, including, but not limited to, excessively high

11  royalty rates based on the selling price of the completed device rather than the value of

12  Qualcomm's contribution to that device.  Qualcomm's acts have also likely harmed the

13  development of cellular technology, as it forced out competitors, thus reducing innovation and

14  competitive pricing.

15         104.   Plaintiffs and members of the proposed Classes were harmed as a direct result

16  of Qualcomm's conduct, which increased the purchase price of their Relevant Cellular

17  Devices.  Additionally, Qualcomm's conduct harmed innovation and competition, which

18  harmed Plaintiffs in the quality and price of their Relevant Cellular Devices.

19                        **SECOND CLAIM FOR RELIEF**

20             **Nationwide Claim For Violation of the Cartwright Act,**

21             **Cal. Bus. & Prof. Code §§ 16700, *et seq*.**

22         105.   Plaintiffs repeat the allegations set forth above as if fully set forth herein.

23         106.   During the Class Period, Qualcomm engaged in monopolistic and

24  anticompetitive conduct in unreasonable restraint of trade and commerce and in violation of

25  California Business and Professions Code sections 16700, *et seq*.  While Section 16700 does

26  not reach solely unilateral conduct by a monopolist, it encompasses agreements between a

27  monopolist and its customers where the monopolist effectively coerces the customer to accede

28  to the restraint in order to obtain the good or service that is the subject of the agreement.  That

1   is what happened here.  Despite its FRAND obligations, Qualcomm unilaterally imposed

2   royalty rates that were unreasonable and exceeded what it could have obtained in a true

3   FRAND negotiation.  This conduct constitutes a "combination" under the Cartwright Act.

4        107.    Qualcomm established an unlawful scheme by which it acquired and

5   maintained monopoly power over the Cellular Device Components through anticompetitive

6   means, including by excluding competition.

7        108.    The Relevant Cellular Devices are commodities.

8        109.    As a direct result of Qualcomm's unlawful conduct, Plaintiffs and the Class

9   were overcharged when they purchased their Relevant Cellular Devices.

10       110.    It is appropriate to apply California antitrust law to the Nationwide Class.

11  Qualcomm is headquartered in California, and Qualcomm subjected its competitors as well as

12  device manufacturers that reside and do business in California to its unlawful conduct.  In

13  doing so, Qualcomm reaped a significant portion of its profits as a result of its unlawful

14  scheme from companies doing business in California.  Additionally, California is the most

15  populous state in the country, for which it was foreseeable that substantial number of

16  California consumers would be impacted by Qualcomm's unlawful behavior.

17                        **THIRD CLAIM FOR RELIEF**

18              **Nationwide Claim For Violations of Unfair Competition Law,**

19                  **Cal. Bus. & Prof. Code §§ 17200, *et seq.***

20       111.    Plaintiffs repeat the allegations set forth above as if fully set forth herein.

21       112.    Qualcomm's conduct constitutes a violation of California's Unfair

22  Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*, which protects consumers from

23  illegal, fraudulent and unfair business practices.

24       113.    Plaintiffs bring this claim on behalf of themselves, the Damages Class, and on

25  behalf of the public as private attorneys general pursuant to Cal. Bus. & Prof. Code § 17204.

26       114.    As discussed above, Qualcomm's conduct constitutes violations of the

27  Sherman Act and the Cartwright Act.  As such, Qualcomm's acts constitute unlawful conduct

28  under section 17200.  Qualcomm unlawfully acquired and maintained its monopoly over the

1  Cellular Device Components through anticompetitive conduct, including, among other things,

2  excluding competitors by refusing to license its technology to them, engaging in exclusive

3  dealing arrangements with its customers to keep out competitors, and forcing device

4  manufacturers to license its patent portfolio.

5      115.    Qualcomm's conduct was deceptive because it induced SSOs to use its

6  technology on the promise it would comply with FRAND.  But after SSOs selected

7  Qualcomm's technology for their standards, Qualcomm refused to comply with its FRAND

8  promises.

9      116.    Qualcomm's conduct is also unfair to Plaintiffs and members of the proposed

10 Classes because as a direct result of its acts described above, Plaintiffs were charged more for

11 their Relevant Cellular Devices than they would have but for Qualcomm's conduct.

12     117.    Plaintiffs on behalf of themselves and the proposed Classes seek and are

13 entitled to all forms of relief available under California's Unfair Competition Law, including

14 but not limited to restitution and disgorgement from Qualcomm of all earnings, profits,

15 compensation, benefits and other ill-gotten gains obtained as a result of its conduct in

16 violation of Business & Professions Code § 17200 *et seq.*

17     118.    It is appropriate to apply California antitrust law to the Nationwide Class.

18 Qualcomm is headquartered in California, and Qualcomm subjected its competitors as well as

19 device manufacturers that reside in California to its unlawful conduct.  In doing so,

20 Qualcomm reaped a significant portion of its profits as a result of its unlawful scheme from

21 companies doing business in California.  Additionally, California is the most populous state in

22 the country, for which it was foreseeable that substantial number of California consumers

23 would be impacted by Qualcomm's unlawful behavior.

24              **FOURTH CLAIM FOR RELIEF**

25        **Violations of State Antitrust and Restraint of Trade Laws**

26     119.    Plaintiffs repeat the allegations set forth above as if fully set forth herein.

27

28

CLASS ACTION COMPLAINT

120.    In the event that the Court does not apply California law on a nationwide basis, Plaintiffs allege the following violations of state antitrust and restraint of trade laws in the alternative.

121.    Defendant Qualcomm's anticompetitive acts described above were knowing, willful, and constitute violations or flagrant violations of the following state antitrust statutes.

122.    <u>Arizona</u>: Qualcomm's monopolization and anticompetitive conduct has restrained trade in violation of Arizona Revised Statutes §§ 44-1401, *et seq*.  During the Class Period, Qualcomm's illegal conduct substantially affected Arizona commerce.  As a direct and proximate result of Qualcomm's unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.  By reason of the foregoing, Qualcomm has monopolized in restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1401, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. §§ 44-1401, *et seq*.

123.    <u>California</u>: During the Class Period, Qualcomm engaged in monopolistic and anticompetitive conduct in unreasonable restraint of trade and commerce and in violation of California Business and Professions Code sections 16700, *et seq*.  While Section 16700 does not reach solely unilateral conduct by a monopolist, it encompasses agreements between a monopolist and its customers where the monopolist effectively coerces the customer to accede to the restraint in order to obtain the good or service that is the subject of the agreement.  That is what happened here.  Despite its FRAND obligations, Qualcomm unilaterally imposed royalty rates that were unreasonable and exceeded what it could have obtained in a true FRAND negotiation.  This conduct constitutes a "combination" under the Cartwright Act.

124.    Qualcomm established an unlawful scheme by which it acquired and maintained monopoly power in the Cellular Device Components through anticompetitive means, including by excluding competition.

125.    The Relevant Cellular Devices are commodities.

126.    As a direct result of Qualcomm's unlawful conduct, Plaintiffs and the Class were overcharged when they purchased their Relevant Cellular Devices.

127.   <u>District of Columbia</u>: Qualcomm's monopolization and anticompetitive conduct has restrained trade in violation of District of Columbia Code Annotated §§ 28-4501, *et seq.*  During the Class Period, Qualcomm's illegal conduct substantially affected District of Columbia commerce.  As a direct and proximate result of Qualcomm's unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.  By reason of the foregoing, Qualcomm has monopolized in restraint of trade in violation of District of Columbia Code Ann. §§ 28-4501, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under District of Columbia Code Ann. §§ 28-4501, *et seq.*

128.   <u>Illinois</u>: Qualcomm's monopolization and anticompetitive conduct has restrained trade in violation of the Illinois Antitrust Act (740 Illinois Compiled Statutes 10/1, *et seq.*).  During the Class Period, Qualcomm's illegal conduct substantially affected Illinois commerce.  As a direct and proximate result of Qualcomm's unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.  By reason of the foregoing, Qualcomm has monopolized in restraint of trade in violation of the Illinois Antitrust Act (740 Illinois Compiled Statutes 10/1, *et seq.*).  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under District of the Illinois Antitrust Act (740 Illinois Compiled Statutes 10/1, *et seq.*).

129.   <u>Iowa</u>: Qualcomm's monopolization and anticompetitive conduct has restrained trade in violation of Iowa Code §§ 553.1, *et seq.*  During the Class Period, Qualcomm's illegal conduct substantially affected Illinois commerce.  As a direct and proximate result of Qualcomm's unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.  By reason of the foregoing, Qualcomm has monopolized in restraint of trade in violation of Iowa Code §§ 553.1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Iowa Code §§ 553, *et seq.*

130.     <u>Kansas</u>: Qualcomm's monopolization and anticompetitive conduct has restrained trade in violation of Defendant has entered into an unlawful agreement in restraint of trade in violation of Kansas Statutes Annotated, §§ 50-101, *et seq*.  During the Class Period, Qualcomm's illegal conduct substantially affected Kansas commerce.  As a direct and proximate result of Qualcomm's unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.  By reason of the foregoing, Qualcomm has monopolized in restraint of trade in violation of Kansas Stat. Ann. §§ 50-101, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Kansas Stat. Ann. §§ 50-101, *et seq*.

131.     <u>Maine</u>: Qualcomm's monopolization and anticompetitive conduct has restrained trade in violation of Maine Revised Statutes (Maine Rev. Stat. Ann. 10, §§ 1101, *et seq*.).  During the Class Period, Qualcomm's illegal conduct substantially affected Maine commerce.  As a direct and proximate result of Qualcomm's unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.  By reason of the foregoing, Qualcomm has monopolized in restraint of trade in violation of Maine Rev. Stat. Ann. 10, §§ 1101, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Maine Rev. Stat. Ann. 10, §§ 1101, *et seq*.

132.     <u>Michigan</u>: Qualcomm's monopolization and anticompetitive conduct has restrained trade in violation of Michigan Compiled Laws Annotated §§ 445.771, *et seq*.  During the Class Period, Qualcomm's illegal conduct substantially affected Michigan commerce.  As a direct and proximate result of Qualcomm's unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.  By reason of the foregoing, Qualcomm has monopolized in restraint of trade in violation of Michigan Comp. Laws Ann. §§ 445.771, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. §§ 445.771, *et seq*.

133.    <u>Minnesota</u>: Qualcomm's monopolization and anticompetitive conduct has restrained trade in violation of Minnesota Annotated Statutes §§ 325D.49, *et seq.*  During the Class Period, Qualcomm's illegal conduct substantially affected Minnesota commerce.  As a direct and proximate result of Qualcomm's unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.  By reason of the foregoing, Qualcomm has monopolized in restraint of trade in violation of Minnesota Stat. §§ 325D.49, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Minnesota Stat. §§ 325D.49, *et seq.*

134.    <u>Mississippi</u>: Qualcomm's monopolization and anticompetitive conduct has restrained trade in violation of Mississippi Code Annotated §§ 75-21-1, *et seq.*  During the Class Period, Qualcomm's illegal conduct substantially affected Mississippi commerce.  As a direct and proximate result of Qualcomm's unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.  By reason of the foregoing, Qualcomm has monopolized in restraint of trade in violation of Mississippi Code Ann. § 75-21-1, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Mississippi Code Ann. § 75-21-1, *et seq.*

135.    <u>Nebraska</u>: Qualcomm's monopolization and anticompetitive conduct has restrained trade in violation of Nebraska Revised Statutes §§ 59-801, *et seq.*  During the Class Period, Qualcomm's illegal conduct substantially affected Nebraska commerce.  As a direct and proximate result of Qualcomm's unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.  By reason of the foregoing, Qualcomm has monopolized in restraint of trade in violation of Nebraska Revised Statutes §§ 59-801, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nebraska Revised Statutes §§ 59-801, *et seq.*

136.    <u>Nevada</u>: Qualcomm's monopolization and anticompetitive conduct has restrained trade in violation of Nevada Revised Statutes Annotated §§ 598A.010, *et seq*.  During the Class Period, Qualcomm's illegal conduct substantially affected Nevada

1   commerce.  As a direct and proximate result of Qualcomm's unlawful conduct, Plaintiffs and

2   members of the Damages Class have been injured in their business and property and are

3   threatened with further injury.  By reason of the foregoing, Qualcomm has monopolized in

4   restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A, *et seq.* Accordingly,

5   Plaintiffs and members of the Damages Class seek all relief available under Nevada Rev. Stat.

6   Ann. §§ 598A, *et seq.*

7          137.   <u>New Hampshire</u>: Qualcomm's monopolization and anticompetitive conduct

8   has restrained trade in violation of New Hampshire Revised Statutes §§ 356:1, *et seq*.  During

9   the Class Period, Qualcomm's illegal conduct substantially affected New Hampshire

10  commerce.  As a direct and proximate result of Qualcomm's unlawful conduct, Plaintiffs and

11  members of the Damages Class have been injured in their business and property and are

12  threatened with further injury.  By reason of the foregoing, Qualcomm has monopolized in

13  restraint of trade in violation of New Hampshire Revised Statutes §§ 356:1, *et seq*.

14  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under

15  New Hampshire Revised Statutes §§ 356:1, *et seq*.

16         138.   <u>New Mexico</u>: Qualcomm's monopolization and anticompetitive conduct has

17  restrained trade in violation of New Mexico Statutes Annotated §§ 57-1-1, *et seq*.  During the

18  Class Period, Qualcomm's illegal conduct substantially affected New Mexico commerce.  As

19  a direct and proximate result of Qualcomm's unlawful conduct, Plaintiffs and members of the

20  Damages Class have been injured in their business and property and are threatened with

21  further injury.  By reason of the foregoing, Qualcomm has monopolized in restraint of trade in

22  violation of New Mexico Stat. Ann. §§ 57-1-1, *et seq.*  Accordingly, Plaintiffs and members

23  of the Damages Class seek all relief available under New Mexico Stat. Ann. §§ 57-1-1, *et seq*.

24         139.   <u>New York</u>: Qualcomm's monopolization and anticompetitive conduct has

25  restrained trade in violation of New York General Business Laws §§ 340, *et seq*.  During the

26  Class Period, Qualcomm's illegal conduct substantially affected New York commerce.  As a

27  direct and proximate result of Qualcomm's unlawful conduct, Plaintiffs and members of the

28  Damages Class have been injured in their business and property and are threatened with

1  further injury.  By reason of the foregoing, Qualcomm has monopolized in restraint of trade in

2  violation of the New York Donnelly Act, §§ 340, *et seq.*  Accordingly, Plaintiffs and members

3  of the Damages Class seek all relief available under New York Gen. Bus. Law §§ 340, *et seq.*

4       140.  <u>North Carolina</u>: Qualcomm's monopolization and anticompetitive conduct has

5  restrained trade in violation of the North Carolina General Statutes §§ 75-1, *et seq.*  During

6  the Class Period, Qualcomm's illegal conduct substantially affected North Carolina

7  commerce.  As a direct and proximate result of Qualcomm's unlawful conduct, Plaintiffs and

8  members of the Damages Class have been injured in their business and property and are

9  threatened with further injury.  By reason of the foregoing, Qualcomm has monopolized in

10  restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq.*  Accordingly,

11  Plaintiffs and members of the Damages Class seek all relief available under North Carolina

12  Gen. Stat. §§ 75-1, *et seq.*

13       141.  <u>North Dakota</u>: Qualcomm's monopolization and anticompetitive conduct has

14  restrained trade in violation of North Dakota Century Code §§ 51-08.1-01, *et seq.*  During the

15  Class Period, Qualcomm's illegal conduct substantially affected North Dakota commerce.  As

16  a direct and proximate result of Qualcomm's unlawful conduct, Plaintiffs and members of the

17  Damages Class have been injured in their business and property and are threatened with

18  further injury.  By reason of the foregoing, Qualcomm has monopolized in restraint of trade in

19  violation of North Dakota Cent. Code §§ 51-08.1-01, *et seq.*  Accordingly, Plaintiffs and

20  members of the Damages Class seek all relief available under North Dakota Cent. Code §§

21  51-08.1-01, *et seq.*

22       142.  <u>Oregon</u>: Qualcomm's monopolization and anticompetitive conduct has

23  restrained trade in violation of Oregon Revised Statutes §§ 646.705, *et seq.*  During the Class

24  Period, Qualcomm's illegal conduct substantially affected Oregon commerce.  As a direct and

25  proximate result of Qualcomm's unlawful conduct, Plaintiffs and members of the Damages

26  Class have been injured in their business and property and are threatened with further injury.

27  By reason of the foregoing, Qualcomm has monopolized in restraint of trade in violation of

28

1    Oregon Revised Statutes §§ 646.705, *et seq.* Accordingly, Plaintiffs and members of the

2    Damages Class seek all relief available under Oregon Revised Statutes §§ 646.705, *et seq.*

3        143.    South Dakota: Qualcomm's monopolization and anticompetitive conduct has

4    restrained trade in violation of South Dakota Codified Laws §§ 37-1-3.1, *et seq.* During the

5    Class Period, Qualcomm's illegal conduct substantially affected South Dakota commerce. As

6    a direct and proximate result of Qualcomm's unlawful conduct, Plaintiffs and members of the

7    Damages Class have been injured in their business and property and are threatened with

8    further injury. By reason of the foregoing, Qualcomm has monopolized in restraint of trade in

9    violation of South Dakota Codified Laws Ann. §§ 37-1, *et seq.* Accordingly, Plaintiffs and

10   members of the Damages Class seek all relief available under South Dakota Codified Laws

11   Ann. §§ 37-1, *et seq.*

12       144.    Tennessee: Qualcomm's monopolization and anticompetitive conduct has

13   restrained trade in violation of Tennessee Code Annotated §§ 47-25-101, *et seq.* During the

14   Class Period, Qualcomm's illegal conduct substantially affected Tennessee commerce. As a

15   direct and proximate result of Qualcomm's unlawful conduct, Plaintiffs and members of the

16   Damages Class have been injured in their business and property and are threatened with

17   further injury. By reason of the foregoing, Qualcomm has monopolized in restraint of trade in

18   violation of Tennessee Code Ann. §§ 47-25-101, *et seq.* Accordingly, Plaintiffs and members

19   of the Damages Class seek all relief available under Tennessee Code Ann. §§ 47-25-101, *et*

20   *seq.*

21       145.    Utah: Qualcomm's monopolization and anticompetitive conduct has restrained

22   trade in violation of Utah Code Annotated §§ 76-10-911, *et seq.* During the Class Period,

23   Qualcomm's illegal conduct substantially affected Utah commerce. As a direct and proximate

24   result of Qualcomm's unlawful conduct, Plaintiffs and members of the Damages Class have

25   been injured in their business and property and are threatened with further injury. By reason

26   of the foregoing, Qualcomm has monopolized in restraint of trade in violation of Utah Code

27   Annotated §§ 76-10-911, *et seq.* Accordingly, Plaintiffs and members of the Damages Class

28   seek all relief available under Utah Code Annotated §§ 76-10-911, *et seq.*

146.   <u>Vermont</u>: Qualcomm's monopolization and anticompetitive conduct has restrained trade in violation of Vermont Stat. Ann. 9 §§ 2453, *et seq.*  During the Class Period, Qualcomm's illegal conduct substantially affected Vermont commerce.  As a direct and proximate result of Qualcomm's unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.  By reason of the foregoing, Qualcomm has monopolized in restraint of trade in violation of Vermont Stat. Ann. 9 §§ 2453, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Vermont Stat. Ann. 9 §§ 2453, *et seq.*

147.   <u>West Virginia</u>: Qualcomm's monopolization and anticompetitive conduct has restrained trade in violation of West Virginia Code §§ 47-18-1, *et seq.*  During the Class Period, Qualcomm's illegal conduct substantially affected West Virginia commerce.  As a direct and proximate result of Qualcomm's unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.  By reason of the foregoing, Qualcomm has monopolized in restraint of trade in violation of West Virginia Code §§ 47-18-1, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under West Virginia Code §§ 47-18-1, *et seq.*

148.   <u>Wisconsin</u>: Qualcomm's monopolization and anticompetitive conduct has restrained trade in violation of Wisconsin Statutes §§ 133.01, *et seq.*  During the Class Period, Qualcomm's illegal conduct substantially affected Wisconsin commerce.  As a direct and proximate result of Qualcomm's unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.  By reason of the foregoing, Qualcomm has monopolized in restraint of trade in violation of Wisconsin Stat. §§ 133.01, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Wisconsin Stat. §§ 133.01, *et seq.*

149.   Plaintiffs and members of the Damages Class in each of the above states have been injured in their business and property by reason of Qualcomm's unlawful monopolization.  Plaintiffs and members of the Damages Class have paid more for Relevant Cellular Devices than they otherwise would have paid in the absence of Qualcomm's

1   unlawful conduct.  This injury is of the type the antitrust laws of the above states were

2   designed to prevent and flows from that which makes Qualcomm's conduct unlawful.

3       150.    In addition, Qualcomm has profited significantly from the aforesaid

4   monopolization.  Qualcomm's profits derived from their anticompetitive conduct come at the

5   expense and detriment of Plaintiffs and members of the Damages Class.

6       151.    Accordingly, Plaintiffs and members of the Damages Class in each of the

7   above jurisdictions seek damages (including statutory damages where applicable), to be

8   trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and

9   costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state

10  laws.

11                  **FIFTH CLAIM FOR RELIEF**

12              **Violation of State Consumer Protection Statutes**

13      152.    Plaintiffs repeat the allegations set forth above as if fully set forth herein.

14      153.    In the event that the Court does not apply California law on a nationwide basis,

15  Plaintiffs allege the following violations of state antitrust and restraint of trade laws in the

16  alternative.

17      154.    Qualcomm engaged in unfair competition or unfair, unconscionable, deceptive

18  or fraudulent acts or practices in violation of the state consumer protection and unfair

19  competition statutes listed below.

20      155.    Arkansas: Qualcomm has monopolized through unfair, unconscionable, and/or

21  deceptive practices in violation of the Arkansas Code Annotated, § 4-88-101, *et. seq.*

22  Qualcomm knowingly acted in restraint of trade or commerce by affecting, fixing, controlling,

23  and/or maintaining at non-competitive and artificially inflated levels, the prices at which

24  Relevant Cellular Devices were sold, distributed, or obtained in Arkansas.  The

25  aforementioned conduct on the part of Qualcomm constituted "unconscionable" and

26  "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10).

27  Qualcomm's unlawful conduct had the following effects: (1) price competition for the

28  Cellular Device Components restrained, suppressed, and eliminated throughout Arkansas; (2)

1   Relevant Cellular Devices prices were raised, fixed, maintained, and stabilized at artificially

2   high levels throughout Arkansas; (3) Plaintiffs and members of the Damages Class were

3   deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class

4   paid supracompetitive, artificially inflated prices for Relevant Cellular Devices.  During the

5   Class Period, Qualcomm's illegal conduct substantially affected Arkansas commerce and

6   consumers.  As a direct and proximate result of the unlawful conduct of Qualcomm, Plaintiffs

7   and members of the Damages Class have been injured in their business and property and are

8   threatened with further injury.  Qualcomm has engaged in unfair competition or unfair or

9   deceptive acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10) and,

10  accordingly, Plaintiffs and members of the Damages Class seek all relief available under that

11  statute.

12       156.   California: Qualcomm has engaged in unfair competition or unfair,

13  unconscionable, deceptive or fraudulent acts or practices in violation of California Business

14  and Professions Code § 17200, *et seq.*  During the Class Period, Qualcomm committed and

15  continue to commit acts of unfair competition as defined by Sections 17200, *et seq.* of the

16  California Business and Professions Code, by engaging in the acts and practices specified

17  above.  This claim is instituted pursuant to Sections 17203 and 17204 of the California

18  Business and Professions Code, to obtain restitution from Qualcomm for acts, as alleged

19  herein, that violated Section 17200 of the California Business and Professions Code,

20  commonly known as the Unfair Competition Law.  Qualcomm's conduct as alleged herein

21  violated Section 17200.  The acts, omissions, misrepresentations, practices and non-

22  disclosures of Qualcomm, as alleged herein, constituted a common, continuous, and

23  continuing course of conduct of unfair competition by means of unfair, unlawful, and/or

24  fraudulent business acts or practices within the meaning of California Business and

25  Professions Code §17200, *et seq.*, including, but not limited to, the following:  (1) the

26  violations of the Sherman Act, as set forth above; (2) the violations of Section 16720, *et seq.*

27  of the California Business and Professions Code, set forth above.  The illegal conduct alleged

28  herein is continuing and there is no indication that Qualcomm will not continue such activity

1   into the future.  The unlawful and unfair business practices of Qualcomm, as described above,

2   have caused and continue to cause Plaintiffs and members of the Damages Class to pay

3   supracompetitive and artificially-inflated prices for Relevant Cellular Devices.  Plaintiffs and

4   members of the Damages Class suffered injury in fact and lost money or property as a result

5   of such unfair competition.  Plaintiffs and members of the Damages Class are accordingly

6   entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings,

7   profits, compensation, and benefits that may have been obtained by Qualcomm as a result of

8   such business practices, pursuant to the California Business and Professions Code, §§ 17203

9   and 17204.

10          157.    District of Columbia:  Qualcomm has engaged in unfair competition or unfair,

11   unconscionable, or deceptive acts or practices in violation of District of Columbia Code § 28-

12   3901, *et seq*.  Qualcomm acted in restraint of trade or commerce by affecting, fixing,

13   controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which

14   Relevant Cellular Devices were sold, distributed or obtained in the District of Columbia.  The

15   foregoing conduct constitutes "unlawful trade practices," within the meaning of D.C. Code §

16   28-3904.  The suppression of competition that has resulted from Qualcomm's conduct has

17   ultimately resulted in unconscionably higher prices for purchasers so that there was a gross

18   disparity between the price paid and the value received for the Relevant Cellular Devices.

19   Qualcomm's unlawful conduct had the following effects: (1) Relevant Cellular Devices price

20   competition was restrained, suppressed, and eliminated throughout the District of Columbia;

21   (2) Relevant Cellular Devices prices were raised, fixed, maintained, and stabilized at

22   artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the

23   Damages Class were deprived of free and open competition; and (4) Plaintiffs and members

24   of the Damages Class paid supracompetitive, artificially inflated prices for Relevant Cellular

25   Devices.  As a direct and proximate result of Qualcomm's conduct, Plaintiffs and members of

26   the Damages Class have been injured and are threatened with further injury.  Defendant has

27   engaged in unfair competition or unfair or deceptive acts or practices in violation of District

28

CLASS ACTION COMPLAINT

1   of Columbia Code § 28-3901, *et seq*., and, accordingly, Plaintiffs and members of the

2   Damages Class seek all relief available under that statute.

3        158.   <u>Florida</u>: Qualcomm has engaged in unfair competition or unfair,

4   unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair

5   Trade Practices Act, Fla. Stat. §§ 501.201, *et seq*.  Qualcomm's unlawful conduct had the

6   following effects:  (1) Relevant Cellular Devices price competition was restrained,

7   suppressed, and eliminated throughout Florida; (2) Relevant Cellular Devices prices were

8   raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3)

9   Plaintiffs and members of the Damages Class were deprived of free and open competition;

10   and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially

11   inflated prices for Relevant Cellular Devices.  During the Class Period, Qualcomm's illegal

12   conduct substantially affected Florida commerce and consumers.  As a direct and proximate

13   result of Qualcomm's unlawful conduct, Plaintiffs and members of the Damages Class have

14   been injured and are threatened with further injury.  Qualcomm has engaged in unfair

15   competition or unfair or deceptive acts or practices in violation of Florida Stat. § 501.201, *et*

16   *seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available

17   under that statute.

18        159.   <u>Missouri</u>: Qualcomm has engaged in unfair competition or unfair,

19   unconscionable, or deceptive acts or practices in violation of the Missouri Merchandising

20   Practices Act, Mo. Rev. Stat. § 407.010, *et seq*.  Plaintiffs and members of the Damages Class

21   purchased Relevant Cellular Devices for personal or family purposes.  Qualcomm engaged in

22   the conduct described herein in connection with the sale of Relevant Cellular Devices in trade

23   or commerce in a market that includes Missouri.  Qualcomm affected, fixed, controlled,

24   and/or maintained, at artificial and non-competitive levels, the prices at which Relevant

25   Cellular Devices were sold, distributed, or obtained in Missouri, which conduct constituted

26   unfair practices in that it was unlawful under federal and state law, violated public policy, was

27   unethical, oppressive and unscrupulous, and caused substantial injury to Plaintiffs and

28   members of the Damages Class.  Qualcomm concealed, suppressed, and omitted to disclose

1  material facts to SSOs concerning its unlawful activities and suppressed, and omitted facts

2  would have been important to SSOs as they related to selecting Qualcomm's technologies into

3  their standards.  Qualcomm's unlawful conduct had the following effects: (1) price

4  competition was restrained, suppressed, and eliminated throughout Missouri; (2) prices of

5  Relevant Cellular Devices were raised, fixed, maintained, and stabilized at artificially high

6  levels throughout Missouri; (3) Plaintiffs and members of the Damages Class were deprived

7  of free and open competition; and (4) Plaintiffs and members of the Damages Class paid

8  supracompetitive, artificially inflated prices for the Relevant Cellular Devices. The foregoing

9  acts and practices constituted unlawful practices in violation of the Missouri Merchandising

10  Practices Act.  As a direct and proximate result of the above-described unlawful practices,

11  Plaintiffs and members of the Damages Class suffered ascertainable loss of money or

12  property.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available

13  under Missouri's Merchandising Practices Act, specifically Mo. Rev. Stat. § 407.020, which

14  prohibits "the act, use or employment by any person of any deception, fraud, false pretense,

15  false promise, misrepresentation, unfair practice or the concealment, suppression, or omission

16  of any material fact in connection with the sale or advertisement of any merchandise in trade

17  or commerce…," as further interpreted by the Missouri Code of State Regulations, 15 CSR

18  60-7.010, *et seq*., 15 CSR 60-8.010, *et seq*., and 15 CSR 60-9.010, *et seq*., and Mo. Rev. Stat.

19  § 407.025, which provides for the relief sought in this count.

20       160.  <u>Montana</u>: Qualcomm has engaged in unfair competition or unfair,

21  unconscionable, or deceptive acts or practices in violation of the Montana Unfair Trade

22  Practices and Consumer Protection Act of 1970, Mont. Code, §§ 30-14-103, *et seq*., and §§

23  30-14-201, *et. seq*.  Qualcomm's unlawful conduct had the following effects:  (1) price

24  competition was restrained, suppressed, and eliminated throughout Montana; (2) prices of

25  Relevant Cellular Devices were raised, fixed, maintained, and stabilized at artificially high

26  levels throughout Montana; (3) Plaintiffs and members of the Damages Class were deprived

27  of free and open competition; and (4) Plaintiffs and members of the Damages Class paid

28  supracompetitive, artificially inflated prices for Relevant Cellular Devices.  During the Class

CLASS ACTION COMPLAINT

1    Period, Qualcomm's illegal conduct described herein substantially affected Montana

2    commerce and consumers.  As a direct and proximate result of Qualcomm's unlawful

3    conduct, Plaintiffs and members of the Damages Class have been injured and are threatened

4    with further injury.  Qualcomm has engaged in unfair competition or unfair or deceptive acts

5    or practices in violation of Mont. Code, §§ 30-14-103, *et seq.*, and §§ 30-14-201, *et seq.*, and,

6    accordingly, Plaintiffs and members of the Damages Class seek all relief available under that

7    statute.

8            161.    New Mexico: Qualcomm has engaged in unfair competition or unfair,

9    unconscionable, or deceptive acts or practices in violation of the New Mexico Stat. § 57-12-1,

10   *et seq.*  Qualcomm acted in restraint of trade or commerce by affecting, fixing, controlling

11   and/or maintaining at non-competitive and artificially inflated levels, the prices at which

12   Relevant Cellular Devices were sold, distributed or obtained in New Mexico.  The

13   aforementioned conduct on the part of the Defendant constituted "unconscionable trade

14   practices," in violation of N.M.S.A. Stat. § 57-12-3, in that such conduct, *inter alia*, resulted

15   in a gross disparity between the value received by Plaintiffs and members of the Damages

16   Class and the prices paid by them for Relevant Cellular Devices as set forth in N.M.S.A., §

17   57-12-2E.  Qualcomm's conduct with regard to sales of Relevant Cellular Devices, including

18   their illegal conduct to fix the price of Relevant Cellular Devices at supracompetitive levels,

19   was substantively unconscionable because it was one-sided and unfairly benefited Defendant

20   at the expense of Plaintiffs and the public.  The suppression of competition that has resulted

21   from Qualcomm's conduct has ultimately resulted in unconscionably higher prices for

22   consumers so that there was a gross disparity between the price paid and the value received

23   for the Relevant Cellular Devices.  Qualcomm's unlawful conduct had the following effects:

24   (1) Relevant Cellular Devices price competition was restrained, suppressed, and eliminated

25   throughout New Mexico; (2) Relevant Cellular Devices prices were raised, fixed, maintained,

26   and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members

27   of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and

28   members of the Damages Class paid supracompetitive, artificially inflated prices for Relevant

1   Cellular Devices.  During the Class Period, Qualcomm's illegal conduct substantially affected

2   New Mexico commerce and consumers.  As a direct and proximate result of the unlawful

3   conduct of Qualcomm, Plaintiffs and members of the Damages Class have been injured and

4   are threatened with further injury.  Qualcomm has engaged in unfair competition or unfair or

5   deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq.*, and,

6   accordingly, Plaintiffs and members of the Damages Class seek all relief available under that

7   statute.

8        162.    New York: Qualcomm has engaged in unfair competition or unfair,

9   unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et*

10  *seq.*  Qualcomm acted in restraint of trade or commerce by affecting, fixing, controlling

11  and/or maintaining, at artificial and non-competitive levels, the prices at which Relevant

12  Cellular Devices were sold, distributed or obtained in New York.  Because of Qualcomm's

13  unlawful trade practices in the State of New York, New York class members who indirectly

14  purchased Relevant Cellular Devices were misled to believe that they were paying a fair price

15  for Relevant Cellular Devices or the price increases for Relevant Cellular Devices were for

16  valid business reasons; and similarly situated consumers were potentially affected by

17  Qualcomm's conduct.  Qualcomm knew that its unlawful trade practices with respect to

18  pricing Relevant Cellular Devices would have an impact on New York consumers and not just

19  Qualcomm's direct customers.  Qualcomm knew that its unlawful trade practices with respect

20  to its royalties and other encumbrances on Relevant Cellular Devices would have a broad

21  impact, causing consumer class members who indirectly purchased Relevant Cellular Devices

22  to be injured by paying more for Relevant Cellular Devices than they would have paid in the

23  absence of Qualcomm's unlawful trade acts and practices.  Qualcomm's conduct described

24  herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y.

25  Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the

26  public at large, and harmed the public interest of New York State in an honest marketplace in

27  which economic activity is conducted in a competitive manner.  Qualcomm's unlawful

28  conduct had the following effects:  (1) Relevant Cellular Devices price competition was

CLASS ACTION COMPLAINT

1   restrained, suppressed, and eliminated throughout New York; (2) Relevant Cellular Devices

2   prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New

3   York; (3) Plaintiffs and members of the Damages Class were deprived of free and open

4   competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive,

5   artificially inflated prices for Relevant Cellular Devices.  Qualcomm's illegal conduct

6   substantially affected New York commerce and consumers, and accordingly Plaintiffs and

7   members of the Damages Class seek all relief available under N.Y. Gen. Bus. Law § 349(h).

8       163.   <u>North Carolina</u>: Qualcomm has engaged in unfair competition or unfair,

9   unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-

10   1.1, *et seq*.  Qualcomm acted in restraint of trade or commerce by affecting, fixing,

11   controlling and/or maintaining, at artificial and non-competitive levels, the prices at which

12   Relevant Cellular Devices were sold, distributed or obtained in North Carolina. Qualcomm's

13   conduct could not have succeeded absent deceptive conduct by Qualcomm to cover up its

14   illegal acts.  Qualcomm's conduct described herein constitutes consumer-oriented deceptive

15   acts or practices within the meaning of North Carolina law, which resulted in consumer injury

16   and broad adverse impact on the public at large, and harmed the public interest of North

17   Carolina consumers in an honest marketplace in which economic activity is conducted in a

18   competitive manner.  Qualcomm's unlawful conduct had the following effects:  (1) Relevant

19   Cellular Devices price competition was restrained, suppressed, and eliminated throughout

20   North Carolina; (2) Relevant Cellular Devices prices were raised, fixed, maintained, and

21   stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of

22   the Damages Class were deprived of free and open competition; and (4) Plaintiffs and

23   members of the Damages Class paid supracompetitive, artificially inflated prices for Relevant

24   Cellular Devices.  During the Class Period, Qualcomm's illegal conduct substantially affected

25   North Carolina commerce and consumers.  Plaintiffs and members of the Damages Class seek

26   actual damages for their injuries caused by these violations in an amount to be determined at

27   trial and are threatened with further injury.  Qualcomm has engaged in unfair competition or

28   unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq*.,

1  and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under

2  that statute.

3  164.  Rhode Island: Qualcomm has engaged in unfair competition or unfair,

4  unconscionable, or deceptive acts or practices in violation of the Rhode Island Unfair Trade

5  Practice and Consumer Protection Act (R.I. Gen. Laws §§ 6-13.1-1, et seq.).  Members of this

6  Damages Class purchased Relevant Cellular Devices for personal, family, or household

7  purposes.  Qualcomm acted in restraint of trade or commerce in a market that includes Rhode

8  Island, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive

9  levels, the prices at which Relevant Cellular Devices were sold, distributed, or obtained in

10  Rhode Island.  Qualcomm's unlawful conduct had the following effects: (1) Relevant Cellular

11  Devices price competition was restrained, suppressed, and eliminated throughout Rhode

12  Island; (2) Relevant Cellular Devices prices were raised, fixed, maintained, and stabilized at

13  artificially high levels throughout Rhode Island; (3) Plaintiffs and members of the Damages

14  Class were deprived of free and open competition; and (4) Plaintiffs and members of the

15  Damages Class paid supracompetitive, artificially inflated prices for Relevant Cellular

16  Devices.  As a direct and proximate result of Qualcomm's violations of law, Plaintiffs and

17  members of the Damages Class suffered an ascertainable loss of money or property as a result

18  of Qualcomm's use or employment of unconscionable and deceptive commercial practices as

19  set forth above.  That loss was caused by Qualcomm's willful and deceptive conduct, as

20  described herein.  Qualcomm has engaged in unfair competition or unfair or deceptive acts or

21  practices in violation of Rhode Island Gen. Laws. § 6-13.1-1, et seq., and, accordingly,

22  Plaintiffs and members of the Damages Class seek all relief available under that statute.

23  165.  South Carolina: Qualcomm has engaged in unfair competition or unfair,

24  unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade

25  Practices Act (S.C. Code Ann. §§ 39-5-10, et seq.).  Qualcomm's monopolization as

26  described herein had the following effects: (1) Relevant Cellular Devices price competition

27  was restrained, suppressed, and eliminated throughout South Carolina; (2) Relevant Cellular

28  Devices prices were raised, fixed, maintained, and stabilized at artificially high levels

throughout South Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for the Relevant Cellular Devices during the Class Period.  Qualcomm's illegal conduct had a substantial effect on South Carolina commerce during the Class Period.  As a direct and proximate result of Qualcomm's unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.  Qualcomm has engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. §§ 39-5-10, *et seq*., and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

166.   Vermont: Qualcomm has engaged in unfair competition and/or unfair, unconscionable, or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq*. Qualcomm acted in restraint of trade or commerce in a market that includes Vermont, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Relevant Cellular Devices were sold, distributed, or obtained in Vermont. Qualcomm's unlawful conduct had the following effects: (1) Relevant Cellular Devices price competition was restrained, suppressed, and eliminated throughout Vermont; (2) Relevant Cellular Devices prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for the Relevant Cellular Devices.  As a direct and proximate result of Qualcomm's violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property.  That loss was caused by Qualcomm's willful and deceptive conduct, as described herein.  Qualcomm's misleading conduct and unconscionable activities constitutes unfair competition and/or unfair or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

## SIXTH CLAIM FOR RELIEF

### Unjust Enrichment

167.   Plaintiffs repeats the allegations set forth above as if fully set forth herein.

168.   As a result of its unlawful conduct described above, Defendant Qualcomm has and will continue to be unjustly enriched.  Qualcomm has been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits related to the Relevant Cellular Devices.

169.   Qualcomm has benefited from its unlawful acts and it would be inequitable for it to be permitted to retain any of the ill-gotten gains resulting from its unlawful practices during the Class Period.

170.   Plaintiffs and members of the Damages Class are entitled to the amount of Qualcomm's ill-gotten gains resulting from its unlawful, unjust, and inequitable conduct.  Plaintiffs and members of the Damages Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and members of the Damages Class may make claims on a pro rata basis.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment that:

1.   The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class;

2.   That the unlawful conduct alleged herein constituted a violation of Sections 2 and 3(b) of the Sherman Act, and the state antitrust and consumer protection laws set forth herein;

3.   Plaintiffs and members of the Damages Class recover damages, to the maximum extent allowed under such state antitrust and consumer protection laws, and that a joint and several judgment in favor of Plaintiffs and members of the Damages Class be

1   entered against Defendant Qualcomm in an amount to be trebled to the extent such laws

2   permit;

3         4.   Plaintiffs and members of the Damages Class recover damages, to the

4   maximum extent allowed by such laws, in the form of restitution and/or disgorgement of

5   profits unlawfully gained from them;

6         5.   Defendant, its affiliates, successors, transferees, assignees and other

7   officers, directors, partners, agents and employees thereof, and all other persons acting or

8   claiming to act on their behalf or in concert with them, be permanently enjoined and

9   restrained from in any manner continuing, maintaining or renewing the conduct alleged

10   herein, or from committing any other conduct having a similar purpose or effect, and from

11   adopting or following any practice, plan, program, or device having a similar purpose or

12   effect;

13         6.   Plaintiffs and members of the Damages Class be awarded restitution,

14   including disgorgement of profits Defendant obtained as a result of their acts of unfair

15   competition and acts of unjust enrichment;

16         7.   Plaintiffs and members of the Classes be awarded pre- and post-

17   judgment interest as provided by law, and that such interest be awarded at the highest legal

18   rate from and after the date of service of this Complaint;

19         8.   Plaintiffs and members of the Classes recover their costs of suit,

20   including reasonable attorneys' fees, as provided by law; and

21         9.   Plaintiffs and members of the Classes have such other and further relief

22   as the case may require and the Court may deem just and proper.

23   <div align="center">**<u>JURY DEMAND</u>**</div>

24       Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil

25   Procedure, of all issues so triable.

26

27   [Signature follows on next page]

28

1  Dated: February 3, 2017                              Respectfully submitted,

2

3                                              By:        */s/ Christopher L. Lebsock*
                                                       Michael P. Lehmann (77152)
4                                                      Christopher L. Lebsock (184546)
                                                       Bonny E. Sweeney (176174)
5                                                      Bruce J. Wecker (78530)
                                                       Samantha J. Stein (302034)
6                                                      **HAUSFELD LLP**
7                                                      600 Montgomery Street, 32nd Floor
                                                       San Francisco, CA  94111
8                                                      Tel: 415-633-1908
                                                       Fax: 415-358-4980
9                                                      Email: mlehmann@hausfeld.com
10                                                     Email: clebsock@hausfeld.com
                                                       Email: bsweeney@hausfeld.com
11                                                     Email: bwecker@hausfeld.com
                                                       Email: sstein@hausfeld.com
12
                                                       Michael D. Hausfeld (*pro hac vice*
13                                                     forthcoming)
14                                                     **HAUSFELD LLP**
                                                       1700 K Street, NW, Suite 650
15                                                     Washington, DC 20006
                                                       Tel: (202)-540-7200
16                                                     Fax: (202)-540-7201
                                                       Email: mhausfeld@hausfeld.com
17
18                                                     Shpetim Ademi (*pro hac vice*
                                                       forthcoming)
19                                                     **ADEMI & O'REILLY, LLP**
                                                       3620 East Layton Avenue
20                                                     Cudahy, WI 53110
                                                       Tel: (414) 482-8000
21                                                     Fax: (414) 482-8001
                                                       Email: sademi@ademilaw.com
22

23

24

25

26

27

28

CLASS ACTION COMPLAINT